WICHITA FALLS COMPRESS CO. et al. v. W. L. MOODY & CO.

(Court of Civil Appeals of Texas. San Antonio. Feb. 5, 1913. Rehearing Denied March 12, 1913.)

1. TRIAL (§ 255*)—LIMITATION OF EVIDENCE —INSTRUCTION—DUTY TO REQUEST.

Where, in an action for fraud in the shipment of certain cotton to plaintiffs, correspondence between plaintiffs and the shipper was admitted, on plaintiffs' promise to prove a conspiracy, over objection that it did not appear that the other defendants had knowledge thereof, it was plaintiffs' duty, and not that of the defendants, on failing to redeem such promise, after having requested a general charge which did not mention such issue, to request an instruction limiting such evidence to its application to the shipper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

2. EVIDENCE (§ 130*)—INDEPENDENT SIMILAR TRANSACTIONS.

Where a compress company was joined as a party to a fraudulent division of certain bales of cotton shipped out to plaintiffs under bills of lading as full bales, evidence that, several months prior to the transaction, the shipper's partner asked witness, who was operating a different compress, to divide certain bales of cotton for him, was inadmissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 403; Dec. Dig. § 130.*]

3. FRAUD (§ 54*)—NOTICE—EVIDENCE.

Where a compress company was charged as a party to the fraudulent division of certain cotton bales shipped to plaintiffs as full bales, evidence that it was not customary to divide cotton at compresses and repack the same so as to make two bales out of one, while not evidence of fraud, was admissible to show that the shipper's request for the compress company so to do was notice to the company that a fraud was intended to be perpetrated by means of its assistance.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 50, 51; Dec. Dig. § 54.*]

4. FRAUD (§ 30*)—DECEIT—EVIDENCE.

A., having contracted to ship certain cotton to plaintiffs, procured defendant compress company to divide 400 bales and recompress the same so as to make 800 apparent full bales, for

which defendant issued a false receipt on which the shipper procured bills of lading from a carrier, describing the cotton as full bales of estimated weight, against which A. drew drafts with bills of lading attached, and succeeded in having the drafts collected from plaintiff before the arrival of the cotton or the discovery of the fraud. *Held*, that the compress company, having issued a false certificate, was estopped to deny that it had participated in the fraud and was liable for the damages sustained, notwithstanding it appeared that the fraud was discovered by a clerk of the railroad company before the shipment of the cotton.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 35; Dec. Dig. § 30.*]

**5. ACTION (§ 45*)—CAUSE OF ACTION — MISJOINDER.**

Misjoinder of causes of action will not bar plaintiffs' recovery on the merits, since if presented by plea in abatement plaintiffs would be required to dismiss to the extent necessary to cure the objection, and if presented in connection with the plea of privilege the sustaining thereof would only require a transfer of the case to the court in which the venue should have been laid.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 378–383, 385–448; Dec. Dig. § 45.*]

**6. INDEMNITY (§ 13*) — BILLS OF LADING—FRAUDULENT ISSUE — CARRIER'S AGENT—RECOVERY OVER.**

Where a compress company was fraudulently induced by a shipper of cotton to divide the bales, and, after recompressing so that the half bales appeared as full bales, issued a certificate to a carrier for full bales, on which the carrier issued bills of lading by which plaintiff, the consignee, was defrauded, and it appeared that it was the duty of the compress company to load the cotton after which it was checked by a servant of the carrier, the fact that such servant acquired knowledge of the fraud in time to have permitted the carrier to notify the consignee, but negligently or willfully failed to do so, did not deprive the carrier of its right to recover over against the compress company for the damages recovered by the consignee against the carrier by reason of the fraudulent issue of the bills.

[Ed. Note.—For other cases, see Indemnity, Cent. Dig. §§ 29–35; Dec. Dig. § 13.*]

**7. SET-OFF AND COUNTERCLAIM (§ 33*)—DAMAGES.**

A shipper of cotton to plaintiffs fraudulently procured defendant compress company to divide the bales into half bales and subsequently shipped them out as full bales in two different lots and collected two drafts attached to bills of lading through different banks. After the fraud was discovered, plaintiff brought an action based on the transaction covered by one of the drafts, and recovered $2,975. *Held*, that defendant compress company, in an action founded on the shipment covered by the other draft, was not entitled to set off the amount so recovered on the other.

[Ed. Note.—For other cases, see Set-Off and Counterclaim, Cent. Dig. §§ 1, 32, 54, 55; Dec. Dig. § 33.*]

**8. APPEAL AND ERROR (§ 1070*)—ERRONEOUS INSTRUCTIONS—RIGHT TO ALLEGE ERROR.**

Where a special charge offered by appellant was erroneous, it was estopped to claim on appeal that the verdict was improper because the jury did not follow such instruction and decided the issues in accordance with the court's general charge.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4231–4233; Dec. Dig. § 1070.*]

**9. TRIAL (§ 252*)—INSTRUCTIONS—EFFECT OF EVIDENCE.**

In an action against a bank and a compress company for damages to plaintiffs arising out of a fraudulent shipment of cotton, a requested charge that the evidence failed to show any conspiracy or agreement between the bank and the compress company, and that the jury must not consider, for any purpose, as against the compress company, any testimony introduced to show liability on the part of the bank, was properly refused, since the bills of lading covering the cotton admitted in evidence were admissible against both parties.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

**10. TRIAL (§ 199*)—INSTRUCTIONS—REQUESTED CHARGE—ADMISSIBILITY OF EVIDENCE.**

Such instruction was also properly refused as authorizing the jury to pass on the admissibility of the evidence as against the bank and the compress company.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 467–470; Dec. Dig. § 199.*]

**11. TRIAL (§ 313*) — SUBMISSION OF CASE—COMMUNICATIONS BETWEEN COURT AND JURY.**

After a jury had retired to a room opening out of the courtroom, the door of which was in the view of the court, the jury sent a written communication to the judge asking whether if they found against all of the defendants they would be obliged to find in favor of defendant railroad company against two other defendants, whereupon the judge wrote on a slip of paper the word, "Yes," and signed his name with the direction that the slip be retained. Thereafter the foreman sent out another slip asking whether, if interest was allowed, it was the duty of the jury to compute it, to which the judge answered on another slip, "Not necessarily." The slips were returned with the verdict and judgment. *Held* that, while such practice was not approved, it constituted a substantial compliance with the statute, providing that when the jury wished to communicate with the court they shall be brought into open court, where their foreman shall state what they desire to communicate.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 730, 746; Dec. Dig. § 313.*]

**12. VENUE (§ 22*)—JOINT DEFENDANTS—JURISDICTION.**

Where a railroad company and a bank and a compress company, located in different counties, were jointly sued for fraud arising out of a shipment of half bales of cotton under bills of lading describing them as full bales, issued by the railroad company on certificates from the compress company, the fact that it might subsequently appear that the railroad company was not liable would not show that it was not fraudulently joined for the purpose of conferring jurisdiction of all the defendants in the county where the railroad company could have been, and was, properly sued.

[Ed. Note.—For other cases, see Venue, Cent. Dig. §§ 35–37; Dec. Dig. § 22.*]

**13. CARRIERS (§ 47*) — BILLS OF LADING—FRAUD—AGENT'S AUTHORITY TO ISSUE—ESTOPPEL.**

Where a carrier acting on the fraudulent certificate of a compress company issued bills of lading for a certain number of full bales of cotton when by reason of a fraudulent recompress only half bales were delivered and shipped to plaintiffs, who were defrauded, the carrier not having denied the authority of its agent to issue the bills, but claiming that he was authorized to issue them for the number of bales specified on "estimated weights" as stated in the bills, it being permitted to transport cotton

without weighing the same, it was estopped to deny that it had received the number of full bales specified in the bill, as against plaintiffs who were bona fide holders thereof.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 107, 108, 134–141, 204; Dec. Dig. § 47.*]

**14. PLEADING (§ 291*)—WRITTEN INSTRUMENT —BILL OF LADING—AUTHORITY TO ISSUE— DENIAL.**

Where, in an action for the fraudulent shipment of cotton, plaintiffs' cause of action as against defendant carrier was in part based on the carrier's bill of lading, want of authority of the carrier's agent to execute the bill could only be pleaded under oath.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 864, 865, 866½–879; Dec. Dig. § 291.*]

**15. CARRIERS (§ 53*) — BILLS OF LADING— SHIPMENT OF COTTON—"BALE"—"ESTIMATED."**

Where there was evidence that a bale of cotton as used in the cotton business means a "bale" weighing approximately 500 pounds, and the term "estimated" as used in a cotton bill means that the cotton is considered as weighing 560 pounds, and a carrier's agent testified that he would not knowingly issue bills of lading for cotton when only half bales had been delivered to the carrier, proof that by a fraudulent certificate of the compress company 485 half bales were delivered to the carrier, for which a bill of lading for 485 bales of estimated weight was issued, did not show that a delivery by the carrier of the half bales so received constituted a sufficient delivery under the bill of lading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 131, 165–167; Dec. Dig. § 53.*
For other definitions, see Words and Phrases, vol. 1, p. 680; vol. 3, pp. 2492, 2493.]

**16. FRAUD (§ 30*)—BILLS OF LADING—FRAUDULENT ISSUE—CARRIER'S LIABILITY.**

A cotton shipper having fraudulently procured a compress company to split bales of cotton, the compress company under a contract with the carrier loaded the cotton, and, having issued fraudulent loading receipts or certificates, the shipper procured a bill of lading from the carrier as for full bales. None of the railroad company's employés had anything to do with the loading, nor had any of such employés, whose duty it was to sign bills of lading, any actual knowledge or notice of the fraud at the time the bill was issued. *Held*, that the compress company was the agent of the railroad company in receiving and loading the cotton, and that the carrier was therefore charged with knowledge of the fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 35; Dec. Dig. § 30.*]

**17. APPEAL AND ERROR (§ 1033*)—RIGHT TO ALLEGE ERROR—CONFLICTING CHARGES.**

Where special requested charges which were not correct and were more favorable than defendant was entitled to, were given, defendant could not object on appeal that there was a conflict between such charges and the charge of the court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

**18. FRAUD (§ 58*) — EVIDENCE — SAMPLES — IDENTIFICATION.**

Evidence *held* sufficient to identify certain samples of cotton as having been taken from the cotton in controversy.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

**19. APPEAL AND ERROR (§ 1047*)—RECEPTION OF EVIDENCE—LIMITATION.**

Where certain evidence was admissible as against one of the defendants and was afterwards limited by the court to its effect as against him, it was not error that the court omitted to limit the evidence when it was received.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4132, 4133, 4146–4152; Dec. Dig. § 1047.*]

**20. APPEAL AND ERROR (§ 730*) — ASSIGNMENTS OF ERROR—REQUESTED CHARGE.**

A contention that the special charge, though erroneous, was sufficient to call the court's attention to the subject-matter, so as to require a correct charge, could not be sustained under an assignment that the court erred in refusing the charge requested.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3013–3016; Dec. Dig. § 730.*]

**21. FRAUD (§ 58*)—FRAUDULENT DRAFTS—LIABILITY OF ACCEPTOR—EVIDENCE OF NOTICE.**

In an action for damages caused to plaintiff as acceptor of a draft attached to a bill of lading for cotton fraudulently shipped, the money having been collected and passed to the drawer's credit by defendant bank and used to satisfy overdrafts of the drawer, evidence *held* insufficient to show that the bank had notice of the drawer's fraud in having the bales split and shipping them as full bales, either at the time of the shipment, or at the time of crediting the proceeds of the draft.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

**22. FRAUD (§ 30*)—DRAFTS—BILLS OF LADING —LIABILITY OF BANK.**

Defendant bank, having tickets for 525 bales of cotton which it was holding as security, delivered the tickets to the owner in order that he might ship out the cotton on the understanding that he was to deliver bills of lading, with drafts attached, to the bank therefor. The owner fraudulently had the bales divided into half bales by recompressing, and fraudulently procured bills of lading on half bales purporting to be for full bales, which with drafts attached were delivered to the bank without notice of the fraud, and by it forwarded and collected, and the major portion of the proceeds applied to the pre-existing debt of the shipper. *Held*, that the money was received by the bank for value, and that plaintiff was not entitled to recover from the bank on the theory that the bill of lading and draft attached were fraudulent.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 35; Dec. Dig. § 30.*]

**23. BANKS AND BANKING (§ 163*)—DRAFTS— COLLECTION—CREDIT.**

Where a bank received from a cotton shipper a draft attached to a fraudulent bill of lading, and at the shipper's request attached a slip requesting the collecting bank to "wire payment," and this having been done, and the bank having thereupon paid out the amount of the draft in accordance with the credit received from the collecting bank, such facts constituted a payment of the draft, and a receipt of the money by the bank in which the draft was deposited.

[Ed. Note.—For other cases, see Banks and Banking,. Cent. Dig. §§ 567–570; Dec. Dig. § 163.*]

**24. BILLS AND NOTES (§ 83*)—DRAFTS—CONDITIONAL ACCEPTANCE.**

A draft received by defendant bank with a bill of lading attached recited after the date "B–L for 485 B–C attached," meaning that a bill of lading for 485 bales of cotton was attached. The draft was indorsed by the drawer

and contained an·indorsement of the bank, by rubber stamp, notifying all persons that the bank was not responsible for the quantity, quality, or delivery of the goods covered by the bill of lading, or otherwise. The draft when presented was accepted without condition. *Held, that the acceptance of the draft was not conditional on the shipment of 485 full bales, and hence the acceptor was not entitled to recover from the bank because only 485 half bales were actually shipped under the bill.*

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 123, 143–148; Dec. Dig. § 83.*]

### 25. FRAUD (§ 30*)—SALE OF GOODS—FRAUD OF DEBTOR.

Where a bank to which certain cotton was pledged permitted debtor to withdraw the same and ship the cotton to a purchaser, the purchase ·price being collected through the bank by means of a draft attached to a bill of lading, the shipper did not thereby become the bank's agent for the sale of the cotton so as to render the bank liable for the shipper's fraud in separating the bales and shipping half bales as bales.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 35; Dec. Dig. § 30.*]

### 26. APPEAL AND ERROR (§ 1050*)—REVIEW—PREJUDICE.

Where, in an action against a shipper of cotton and a compress company for fraud in shipping half bales for bales, the correspondence between the consignee and· the shipper with reference to the consignment was erroneously admitted as against the compress company, but did not in any manner reflect on it, a judgment against the compress company would not be reversed for such error, under Supreme Court rule 62a (149 S. W. x), providing that a reversal can only be had when the error amounted to a denial of the rights of appellants. and was reasonably calculated to cause a rendition of an improper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

### 27. APPEAL AND ERROR (§ 1050*)—REVIEW—ADMISSION OF EVIDENCE—PREJUDICE.

Where defendant compress company participated in a fraudulent shipment of cotton by dividing the bales at the request of the shipper and issuing certificates for full bales, on which the shipper was permitted to procure bills of lading, evidence erroneously admitted against the compress company, that the shipper's partner on a prior occasion had approached the witness and endeavored to get him to divide cotton bales, was not prejudicial to the compress company.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by W. L. Moody & Company against the Wichita Falls Compress Company and others. Judgment for plaintiffs against the Wichita Falls Compress Company and others. From a judgment for plaintiffs against defendants City National Bank of Bowie, Tex., Wichita Falls Compress Company, and Missouri, Kansas & Texas Railway Company, they appeal. Affirmed as to the Compress Company and the Railroad Company, with judgment over in favor of the Railroad Company against the Compress Company, and reversed as to defendant bank.

Crane & Crane, A. S. Coke, A. H. McKnight, Thomas & Rhea, and Cockrell, Gray & Thomas, all of Dallas, J. W. Chancellor, of Bowie, and Montgomery & Britain, of Wichita Falls, for appellants. Speer & Weldon, of Bowie, Terry, Cavin & Mills, of Galveston, and Spence, Knight, Baker & Harris, of Dallas, for appellees.

MOURSUND, J. This is a suit by W. L. Moody & Co. against Hudspeth, Alexander & Co., a firm composed of A. D. Hudspeth and G. Alexander, and against the members of said firm individually, the City National Bank of Bowie, Tex., hereinafter called "Bank," the Wichita Falls Compress Company, hereinafter called "Compress Company," the Missouri, Kansas & Texas Railway Company, hereinafter called "Railway Company."

The petition on which the case went to trial contained the following allegations:

That on or about March 7, 1910, Hudspeth, Alexander & Co., with intent to defraud plaintiffs out of large sums of money, proposed by telegraphic communications sent from Bowie, Tex., to plaintiffs at Galveston, Tex., *to ship plaintiffs 800 bales of early cotton* of average weight and grade, none below strict middling, to be sold by plaintiffs, as cotton factors and commission merchants, prior to May 1, 1910, on regular factors' terms, and to draw upon plaintiffs against said shipment of cotton, with bills of lading attached to drafts, the sum of $55 per bale, which proposition plaintiffs accepted. That, before accepting the proposition, plaintiffs, being informed that said G. Alexander was a customer of defendant Bank, communicated with said Bank by telephone, notifying it of the offer so made, and asked if its relations with Alexander had been satisfactory and if plaintiffs could safely rely upon his representations with reference to said cotton, to which the Bank replied that Alexander was its customer, and falsely and fraudulently replied that its relations with him had been satisfactory and that plaintiffs could rely upon his representations with regard to said cotton, and, but for said information thus given, plaintiffs would not have accepted said proposition. Further, that said Bank knew of the said Hudspeth, Alexander & Co.'s intention of defrauding plaintiffs, and gave said information to assist them in carrying out such intention, and conspired with them to accomplish such purpose. That the relations between Alexander and the Bank were not satisfactory, that the firm of which he was a member was heavily indebted to the Bank, and said Bank knew said firm was insolvent, and that plaintiffs could not safely rely upon Alexander's representations with reference to said cotton. That said firm owed the Bank a large overdraft which was the occasion of dissension in said Bank and for

criticism of its active officers, by reason of which constant requests were made upon said firm to pay the Bank, but that none of said facts were communicated to plaintiffs. That, by all dealing in and handling cotton, "early cotton" means, and at all times alleged in the petition meant, cotton ginned and prepared for market early in the season, free from boll, leaf, and trash; and "average weight" means, and meant, that the average weight of a given number of bales of cotton shall be approximately 500 pounds per bale, and "bales" of cotton means and meant, packages or bales of the average weight of approximately 500 pounds, and plaintiffs and all the defendants at all the times mentioned in the petition well knew said meaning of said words.

That at said time Hudspeth, Alexander & Co. had or procured 400 bales of cotton, gathered late in the season and of inferior grade, and delivered said cotton to the Compress Company and procured it to split said bales of cotton each into two bales and to prepare same so as to make each half bale appear to be a full compressed bale, and to assist it in shipping same as full bales, and to procure bills of lading as for full bales, to the end that it would be made to appear that they had bills of lading for 800 instead of 400 bales of cotton. That said Compress Company delivered said cotton to Railway Company as full bales, certifying to it that same were bales of cotton. That, in order to procure the assistance of the Compress Company in this matter, they agreed to pay a compensation beyond that company's ordinary charges for compression. That said company knew of the fraudulent designs of said Hudspeth, Alexander & Co. to swindle plaintiffs or others and the purchasers of all bills of lading which might be issued in pursuance of such design. That the Compress Company failed to compress said cotton to the density required by custom between railroad and compress companies and by the regulations of the Railroad Commission. That, if Compress Company did not in fact know of the fraudulent intention and design of Hudspeth, Alexander & Co., the requests made to them were so unusual and extraordinary that they were put upon notice of the fraudulent purposes of Hudspeth, Alexander & Co. and negligently participated therein so as to make themselves liable. That 485 bales of said cotton were loaded by the Compress Company for the Railroad Company in pursuance of prearrangement, custom, and course of dealing between it and Railroad Company, and Compress Company issued a certificate that 485 bales of cotton of given marks and brands had been received from G. Alexander for shipment, via Missouri, Kansas & Texas Railway Company of Texas to Galveston, and said parties applied to Railway Company for bill of lading for full bales of cotton, and Railway Company assented to such request, accepted said

certificate, waived its rules, which provide that, in case of shippers permanently located at said stations, it should be furnished an affidavit once each week covering shippers' weights to be inserted in bills of lading, and contrary to its rules and custom, and the general rule and custom of the trade, accepted said packages as bales of cotton and issued bill of lading for 485 bales of cotton, by which it recited and represented that it had received that number of bales consigned to shipper's order, notify W. L. Moody & Co., Galveston, Tex., and by which it bound itself to deliver 485 bales of cotton at Galveston, Tex. That thereby it contracted with said other parties to the suit, or some of them, that it had received and was transporting said number of bales of cotton, but failed to put the dealers in said bill of lading on notice that it had received only half bales.

That all the defendants knew it was the custom among shippers of cotton to attach the bills of lading to drafts drawn against banks, purchasers, or other consignees of cotton, in favor of themselves, bearers, or other payees, or order, and would place same in the bank where the bills of lading would be accepted as importing that the Railway Company had received the merchandise and was transporting same as set forth in such bills of lading. That Railway Company knew, or by the exercise of reasonable diligence could have known, that said packages of cotton were not bales of cotton, but half bales, but recklessly and negligently, in pursuance of the plans proposed by the other defendants and adopted by it, accepted said packages as being bales of cotton and issued its bill of lading, knowing it would be used to obtain funds from some person upon the strength of their belief in the recitation therein contained that said packages were bales of cotton, and also with notice and knowledge that the other defendants intended to use said bill of lading in some business transaction with W. L. Moody & Co. That under the regulations imposed by the Railroad Commission the Railway Company was required to take charge of and receipt for said cotton on the platform of the Compress Company in the same manner as if tendered at its depot. That at or about the time of the issuance of said bill of lading Compress Company, or another, made inquiry of said Railway Company, its agents or employés, whether it would issue and deliver bill of lading for said cotton without stating in same the weights of the cotton, by which it was further put upon notice of the fraudulent designs of the shippers and those acting in collusion with them. Further, that Railway Company issued said bills of lading without stating therein the weights of the cotton, but wrote in the column provided for weights the abbreviation "est.," meaning thereby estimated, but in fact no estimate was made, although said Railway Company

knew that when the weight was stated in the manner aforesaid it was understood by all in the business of operating railroads and compresses, and in the business of banking and the business of cotton buyers and factors and commission merchants, to mean that such cotton had not been weighed, but that the weights had been carefully, fairly, and honestly estimated by the carrier issuing such bill of lading, and that it was estimated to weigh an average of approximately 500 to 560 pounds per bale.

That said Compress Company marked said packages of cotton with marks necessary to represent full bales, and issued and delivered to said Railway Company a written, or partly written and partly printed, receipt or certificate, by which it certified that it had received from said G. Alexander 485 bales of cotton, to be shipped to Galveston by Railway Company, when in fact the cotton described in such receipt was in packages containing half bales, and that it in like manner issued receipt for the other 315 bales. That if said Railway Company used any diligence to ascertain whether said cotton was bales of cotton of average weight, it was by having same examined, inspected, and checked by one or more of its agents or servants by which it discovered, or by the use of ordinary care could have discovered, that it was in fact only half bales. That about March 16, 1910, Hudspeth, Alexander & Co. caused G. Alexander to indorse his name in blank on the said bill of lading for 485 bales of cotton, and to make draft upon W. L. Moody & Co. payable to the order of City National Bank of Bowie, Tex., for $26,675, said draft reciting and being conditioned that bill of lading for 485 bales of cotton was attached thereto, and caused said draft to be signed by said Alexander and indorsed by. him in blank, and to attach said bill of lading to same, and deliver draft and bill of lading to said Bank, requesting said Bank to collect same from W. L. Moody & Co., and deliver bill of lading upon payment of said draft. That said Bank, knowing the participation of the other defendants in the conspiracy to defraud plaintiffs, received said draft and caused same to be collected from W. L. Moody & Co., which payment by W. L. Moody was made solely upon the faith of representations contained in said bill of lading, and the conditions in said draft, that said bill of lading did import 485 bales of cotton, and not upon any reliance upon the credit of G. Alexander and A. D. Hudspeth, nor of Hudspeth, Alexander & Co., nor on account of any funds any of said parties had with W. L. Moody & Co. That plaintiffs relied upon and were deceived by all of said representations made to secure the bill of lading, those contained in the bill of lading and the draft, and the statement that said cotton had been estimated, and that same comprised bales, and not half bales, and paid said draft be-

fore said cotton had arrived at Galveston.

That said Hudspeth, Alexander & Co. were indebted to said Bank to the extent of more than $31,000, which indebtedness was unsecured, and said firm and its members were insolvent, as said Bank well knew, and before receiving the proceeds of such draft fraudulently and wrongfully applied all or some of the forthcoming proceeds of the payment of plaintiffs upon said draft to the indebtedness due said Bank by said firm, with full knowledge of all the facts. That thereafter said Bank received and still retains plaintiffs' money as aforesaid. That the payment of said draft was made upon a mistake of fact and because of the fraud perpetrated upon it by the other defendants herein, and by reason thereof it is entitled to trace same into the possession of said Bank and recover same, and also because of the breach of the conditions contained in the draft and bill of lading. That, if plaintiffs are mistaken in alleging that said Bank had no security for its said debt, then that such security was only as to part of the debt and consisted of a pledge to it of part of said cotton, or cotton tickets or warehouse receipts therefor, which cotton plaintiffs tendered back to defendants, which tender all defendants refused, and they are allowed credit for the full value of said cotton in this petition. That said money having come into the hands of the Bank by means of such fraud, it received same in trust for plaintiffs and is liable to plaintiffs for the same less the value of the cotton upon which it held such lien. That thereafter said cotton was delivered to plaintiffs and weighed approximately 115,203 pounds, being an average of about 237 pounds per half bale of cotton, and was all of low and inferior grade. That said cotton was of the value of about $13,448.49, after deducting the cost of conditioning, caring for, storing, putting in bales of merchantable weight, and marketing same, and had it been of the weight and as represented would have been worth not less than the amount of said draft. That defendants having refused the tender of said cotton upon condition of reimbursing plaintiffs for the amount paid out, plaintiffs sold said cotton, realizing net the sum of $13,-448.59. That by reason of the matters and things set out, plaintiffs were damaged in the sum of $13,226.61, with interest and costs, for all of which they prayed judgment against all of the defendants and each of them.

Plaintiffs filed trial amendment identifying certain paragraphs of rules of Railroad Commission attached to answer of Railway Company as the rules mentioned in their petition, and stating the gross amount received for the cotton as $15,161.34, also stating the various items of expense incurred with reference to the cotton.

The Compress Company filed plea of privilege to be sued in Wichita county, Tex., al-

leging that the Railroad Company was fraudulently joined for the purpose of giving jurisdiction in Dallas county. It answered by general denial and a plea in reply to both plaintiffs and the Railway Company alleging that it never issued, approved, or authorized the issuance of any such bills of lading alleged by plaintiff; that the bills of lading approved by it were open bills reading from Alexandre as consignor to Alexandre as consignee, and were not negotiable; that it made no representations as to the weight of the cotton; that the Railway Company had full knowledge and notice of all facts with reference to said cotton and knew that the original bales had been divided. It further alleged that plaintiffs had collected $2,975 from G. Alexander, which is pleaded as an offset against any judgment in favor of plaintiffs.

The Missouri, Kansas & Texas Railway Company of Texas answered by general denial, and special answer setting up the rules and regulations of the Railroad Commission of Texas in regard to handling cotton, certified copies of which were attached to the answer, and further alleged that it accepted said cotton while on the platform of said compress in accordance with the requirements of said rules and regulations; that it had no knowledge of the actual condition of the cotton at the time it issued the bills of lading, and same were executed, under the universal rule and custom of all railway companies in the state of Texas, upon the certificate and receipt of the Compress Company, which receipts and certificates were set out in full; that in executing the bills of lading it acted entirely upon the faith of the recitations contained in said receipts and certificates. Further, that in the absence of the sworn weights furnished by the shipper it was not allowed to insert in the bills of lading any weights of the cotton, and the term "estimated," used in said bills, was known to plaintiffs to mean that the cotton had not been weighed, and that the bills as issued contained no misrepresentations; that its agent who issued the bills of lading had no notice of the split condition of the cotton and no opportunity to acquire such notice, and had no notice of the design of Hudspeth, Alexander & Co. to swindle plaintiffs; that the identical cotton received by it was delivered to plaintiffs; that plaintiffs were familiar with the rules, regulations, and customs of handling cotton over the railroads in the state of Texas, and fully knew from the use of the term "estimated" that said cotton had not been weighed, and no representation was made by it in said bills as to the weight of said cotton; that, under the circumstances, plaintiffs were guilty of negligence in paying the draft of an entire stranger on his representations as to weight and grade of the cotton; that in issuing the bills of lading it acted wholly upon the representations or recitals contained in the certificates issued by Compress Company, and, if the same contained any misrepresentations as to the amount of cotton received, it was induced to execute the same by reason of the certificates so issued by said Compress Company, and said company knew at the time of its issuance thereof that this defendant would execute a bill of lading on the faith thereof, and prayed that, if any judgment was rendered against it, it have judgment over against said Compress Company for a like amount. Further, that if said Compress Company was its agent in loading the cotton, as alleged by plaintiff, and that by reason thereof it was chargeable with the knowledge of said Compress Company, and if by reason of such imputed knowledge it should be held liable to plaintiffs, then that it recover over against the Compress Company. Further, that if said City National Bank of Bowie participated in the proceeds of the scheme by which plaintiffs were defrauded, with notice of such fraudulent scheme, as alleged by plaintiff, that as between it and said Bank, it was entitled to recover over against said Bank if it should be held liable to plaintiffs, and it so prayed.

Defendant Bank filed plea of privilege to be sued in the county of Montague, and answering filed demurrer, various special exceptions, a general denial, and a special answer containing in substance the following allegations: That in the spring of 1909 the firm of Hudspeth, Alexander & Co. opened an account with said Bank, drawing drafts on it and pledging cotton tickets with it as security, and upon sale of the cotton would procure the tickets from this defendant, and with same procure bills of lading, which would be attached to drafts collected by and through this defendant, and the money derived from such sales would be immediately placed to the liquidation of such balance. That at the end of the cotton season of 1909 said firm owed the Bank nothing. That during the season of 1909 and 1910, which began late in the summer of 1909, said firm again began business with the Bank, and same was conducted in the same manner as during the former season, and about the 16th or 17th of March, 1910, said firm owed the Bank between $25,000 and $26,000, and the Bank had as security 529 bales of cotton stored at the Wichita Falls Compress, the tickets for which were in possession of the Bank as security for said indebtedness. That said cotton was worth about $70 per bale, and the amount was amply secured. That said G. Alexander informed the Bank that he wished to ship the said cotton on consignment to W. L. Moody & Co., and to enable him to do so it delivered to him the tickets so that he could procure bills of lading as he had been doing during the season. That he took the tickets and brought back two bills of lading, one for 485 bales of cotton and the other for 38 bales of cotton, each marked, "Shipped to order of G. Alexander

at Galveston, notify W. L. Moody & Company"; the bills reciting that the weights were estimated, which meant that the cotton had not been weighed at its point of origin. That said Alexandre drew drafts on Moody & Co. through this Bank, one for $2,090 with bill of lading attached for 38 bales, and the other for $26,675 with bill of lading attached for 485 bales of cotton, but before accepting same, and before forwarding them for collection, the Bank, as was its custom, stamped on each of them the following notice, "Notice—This Bank hereby notifies all parties concerned that it is neither responsible for the quality, quantity nor delivery of the goods covered by the bill of lading, or otherwise," signed, City National Bank of Bowie, Tex. That, notwithstanding said notice and the fact that the bills of lading advised that the cotton had not been weighed, Moody & Co. paid said drafts on presentation, and the proceeds thereof came into the hands of this Bank. That after being advised of the collection of said drafts this defendant credited Hudspeth, Alexander & Co. with same, applying the credit thereof to the liquidation of their indebtedness, and they checked out the balance of said account, and the $4,000 collected through the First National Bank of Bowie was deposited with it the same day and checked out by Hudspeth, Alexander & Co.

Further, this defendant specially denied that it entered into any conspiracy with anybody to defraud Moody & Co. and that it had any notice, knowledge, or information of any irregularity or anything unusual in the shipment of said cotton. It alleged further that plaintiffs had recovered from G. Alexander $2,975, and had an opportunity to recover $1,000 more, in that it enjoined payment of drafts to that amount in the possession of Hudspeth and had voluntarily dismissed the suit; that plaintiffs were negligent in not collecting said amount as well as in paying said drafts, and in any event this defendant should have credit for said $2,975; that this defendant had no notice of any fraudulent act or conduct of Hudspeth, Alexander & Co. until long after the money had been collected on the drafts and applied as aforesaid; that it had given up its security, which was ample, at the request of plaintiffs, wherefore plaintiffs were estopped to claim any damages.

The case was dismissed as to G. Alexander, individually. The jury returned a verdict in favor of the plaintiffs against all the defendants for $13,226.51, with interest at 6 per cent. from March 17, 1910, and in favor of the Railway Company over against the Compress Company and the Bank, and found against the prayers of the Compress Company and the Bank for judgment over against other codefendants. Judgment was rendered overruling all pleas of privilege, and upon the merits in accordance with the verdict of the jury, from which judgment appeals have been perfected by the Railway Company, the Compress Company, and the Bank.

The following facts are undisputed, and give a general outline of the case:

A. D. Hudspeth and G. Alexandre composed the firm of Hudspeth, Alexander & Co., and were engaged in the cotton business, with headquarters at Bowie, Tex. This firm was largely indebted to the City National Bank of Bowie, also the First National Bank of Bowie, both of which held as collateral security for such indebtedness cotton tickets, issued principally by the Wichita Falls Compress Company. In March, 1910, said Alexandre arranged with Moody & Co., who were engaged in the cotton business at Galveston, by letters and telegrams, to ship them 800 bales of cotton of average weight and grade, with the right to draw on them with bill of lading attached to draft for $55 per bale, which amount Moody & Co. agreed to advance, as well as further amounts after the cotton arrived at Galveston, provided the weight and grade of the cotton justified such additional advances.

After the agreement was made, Hudspeth, Alexander & Co., for the purpose of shipping the cotton to Moody & Co., secured from said banks the cotton tickets held by them as collateral, and procured the Wichita Falls Compress Company to divide or split 400 bales of cotton and recondition it so as to give it the outward appearance of 800 bales of cotton. The superintendent of said Compress Company, acting for the same, issued to Alexandre three receipts (or O. K.'s), one for 38 bales of cotton, weight 31,320 pounds, one for 485 bales of cotton, weight estimated, and the other for 315 bales of cotton, weight estimated, all of which tickets showed shipment via Missouri, Kansas & Texas, destination Galveston. These receipts were attached to bills of lading for their respective amounts of cotton, upon blanks of said Missouri, Kansas & Texas Railway Company of Texas. Bills of lading, with said receipts attached, showing that the cotton was received from G. Alexandre and consigned to his own order, Galveston, Tex., notify W. L. Moody & Company, were presented to the employé of said Railway Company in charge of its local freight office at Wichita Falls, who executed the same in the name of the local freight agent. On March 16, 1910, G. Alexandre drew a draft through the City National Bank of Bowie for $26.675 on Moody & Co., to which the bill of lading for 485 bales was attached. This draft was paid and the proceeds applied by the Bank to the account of Hudspeth, Alexander & Co., which left said firm a balance after paying their indebtedness to the Bank, and said balance was regularly checked out in a few days. The bill of lading for 315 bales was attached to a draft on Moody & Co. for $17,-

325, drawn through the First National Bank of Bowie, and, being paid, the proceeds were applied to the payment of said firm's indebtedness to that Bank. When the cotton arrived at Galveston and was delivered at the Moody press, the light condition of the 800 bales was discovered. The same were weighed and stored by Moody & Co. and sold in June of the same year. Moody & Co. deducted from the proceeds the storage insurance, commission for selling, cost of reconditioning, and expense of handling said cotton, and credited the two drafts with the net amount so obtained from the proceeds of said cotton. They then brought two suits in the district court of Dallas county, one being this suit, which is for the loss sustained on the draft attached to bill of lading for 485 bales of cotton, and the other suit being for the loss sustained on the draft attached to bill of lading for 315 bales of cotton, which suit is against all the parties who were made defendants in this case, as well as against the First National Bank of Bowie.

Other facts relating to the liability of the respective defendants will be stated in passing on the assignments questioning such liability.

We will first take up the brief of the Compress Company.

[1] The first assignment is based upon the admission of the letters and telegrams between Moody & Co. and G. Alexandre with reference to the consignment of cotton by Alexandre to Moody, over the objections that it does not appear the Compress Company had any knowledge of said correspondence, and the same was not admissible against said company, though admissible against Alexandre. Appellees contend that the defendants against whom same was not admissible should have requested instructions to the effect that same could not be considered against them. In general this is the correct rule. However, in this case it is shown that at the time of the admission of the evidence it was expressly stated by counsel for appellees that they would later prove a conspiracy between all the defendants. Having failed to redeem such promise, and in fact prepared a general charge for the court which did not mention the issue of conspiracy, it was incumbent on appellees to request an instruction limiting said testimony, and not upon this appellant. Root v. Kansas City R. S. Co., 195 Mo. 348, 92 S. W. 621, 6 L. R. A. (N. S.) 223; Smith v. Sedalia, 182 Mo. 1, 81 S. W. 167.

[2] The second assignment complains of the admission of the testimony of W. O. Layton to the effect that, several months prior to the transaction involved in this suit, defendant Hudspeth asked witness, who was running a compress at Bowie, Tex., to tear up some cotton for him; that some of the bales were too large, and he wanted to divide them up; that he (witness) replied he did not care to do it. The objection made was as follows: "Because the transaction testified about occurred long before the conspiracy claimed by the plaintiff could have been formed and was an independent transaction, no part of the res gestæ of the transaction involved in this suit, and it was not shown that this defendant had any knowledge of it and it was immaterial, but calculated to affect the verdict." The evidence should not have been admitted against this defendant, and the assignment is sustained.

The third assignment is also based upon the admission of certain other testimony given by the witness Layton and is sustained.

[3] The fourth assignment is overruled. While evidence that it had not been customary to divide or split cotton at compresses and repack same so as to make two bales is no evidence of fraud, yet it was admissible to show the unusual nature of the request made of this defendant by Alexandre, and the request, being unusual, can legitimately be considered as a circumstance tending to put this defendant on notice that a fraud was intended to be perpetrated by means of its assistance.

Assignments 5 and 6 complain of the refusal of peremptory instructions in favor of this defendant. We overrule these assignments, and will state briefly the facts upon which we base the liability of this defendant, in so far as said facts have not heretofore been stated by us.

[4] Trueblood, superintendent of the Compress Company, testified that Hudspeth asked him to call up the railroad office and ask if they would ship out the 38 bales on estimated weights; that up to that time they had not shipped out any cotton on estimated weights; that Hudspeth told him the cotton he wanted split was some that Alexandre had sold and agreed to deliver in California in small bales; that they split the cotton and repacked it so as to resemble ordinary bales; that he refused to O. K. the bills of lading until the cotton was made into 800 bales, as a usual thing, though he O. K.'d a man's bill of lading when he presented it to him with instructions, that is, if the cotton was there; that he was aware of the provisions of the Railroad Commission rules requiring railroads to accept cotton on the platform of the Compress Company, provided the Compress Company carried insurance to cover it, which this appellant did; that with one exception, in 12 years' experience, it had always been usual and customary for the Railroad Company to sign bills of lading on the faith of his O. K., and they never weighed or counted the cotton or had anything to do with it prior to the time the bills of lading were issued that he knew of; that Hudspeth had procured him to split two 75-bale lots of cotton before that and make 100-bale lots out of same, stating he had sold some cotton, and the cotton had gone up on

him, and he wanted to fill his contract with him as little cotton as he could; that he never had split any big lot of cotton before this transaction and made twice as many bales out of it; that he required extra compensation for splitting said cotton in addition to the regular charge for compressing, and required Hudspeth to furnish the bagging, and also exacted an indemnity agreement for any claim that might arise because said cotton was not of the proper density; that he took said agreement, which, according to his information, would have applied if the cotton was going export, although he relied entirely on Hudspeth's statement that the cotton was going to Galveston and from there to Oakland, Cal.; that Hudspeth, Alexander & Co. at that time owed them a bill for patching and handling cotton, which they paid; that they charged the Railroad Company the full 10 cents per hundred pounds on 560 pounds for compressing charges which was paid, but refunded after being furnished weights of the cotton at Galveston, as they did in all cases.

The sheriff of Montague county and Graham, adjuster for appellees, both testified that Trueblood, about March 24, 1910, stated that he handled this Hudspeth, Alexandre transaction, and that he suspected and thought a fraud was intended at the time, or words to that effect; that he suspected the transaction was not correct, and stated that he took the indemnity; and that Hudspeth had told him many lies. Graham's testimony was, further, that Trueblood stated his suspicions were aroused to such an extent that he took a release from Hudspeth of liability in the matter and showed him the release. The false receipt and representations were issued by the Compress Company covering the 485 bales of cotton, and attached to the bill of lading described in plaintiff's petition. Trueblood testified that the bill of lading presented to him by Hudspeth was not the one actually issued, but one by G. Alexander to G. Alexandre. It was the custom for the shipper to make out a bill of lading, then procure receipt from the Compress Company and attach same, and then have bill of lading signed by the agent of the Railroad Company. Trueblood testified he would not have O. K.'d the bill of lading described in plaintiff's petition had it been presented to him; that is, if the cotton had been shipped without its being weighed. On the same day as the issuance of the receipt mentioned, the Compress Company issued 17 loading slips, 16 for 50 bales each and 1 for 38 bales, certifying that 838 bales of cotton of the weight of 28,000 pounds per 50-bale lots, such weight stated, under the words, "Weight sworn estimated," neither of which was struck out, had been shipped from Wichita Falls over the Missouri, Kansas & Texas Railroad, destination Galveston, on that date in certain car number

and initials, said certificate being signed W D. Trueblood, compress superintendent, F. E. McKay, railroad agent.

The Compress Company says it should not be held liable for doing a legal act, viz., splitting the bales of cotton. If this was all it had done, certainly it would not be liable; but, under the facts as set out, which by repeating all the testimony would be made even stronger, it is apparent that said company had ample knowledge of facts putting them upon notice that Hudspeth, Alexandre & Co. were going to try to perpetrate a fraud upon somebody. Trueblood's statement to the sheriff and Graham, as detailed by them, while denied by him, must be taken as true in passing on this assignment. Having such suspicions and knowledge, he certainly acted in bad faith with the Railroad Company, and in reckless disregard of the rights of others, in not insisting that the cotton be shipped on sworn weights. His knowledge of the falsity of his certificate is conclusively shown by his refusal to issue same until he had made 800 bales out of the 400; he sought to delude his conscience by first creating the semblance of things admitted by him as not existing in fact. Nor should said company be heard to say that, while issuing a false certificate, it was not guilty of participation in the fraud because, if the bill of lading shown Trueblood had been used, the fraud might not have occurred. Having assisted in the fraud by issuing a false certificate, it should not be permitted to avoid liability by saying it was negligent in not seeing that such certificate was not detached from such bill of lading and attached to another. However, the evidence of the railway clerk at Galveston shows that even such a bill as Trueblood described could have been used as the bills in evidence were used, though not with equal facility, and in support of the verdict we must find that this fact was found by the jury under the charge of the court. Had Trueblood been as innocent in the matter as the Compress Company would have us believe, and had really believed that Hudspeth did not intend to commit a fraud, he would have proposed to issue receipt for 800 half bales, instead of stating that he would issue receipt for 800 bales as soon as he could accomplish the task of making the same out of 400 bales. The issuing of a false certificate constituted a fraudulent act under the circumstances of this case, and it was intended that upon the faith of it a bill of lading should be issued, and that said bill of lading would represent that 800 bales of cotton, within the ordinary and usual meaning of the term bales of cotton, had been received and transported. This appellant should not be heard to say that it did not intend the natural consequences arising from its fraudulent acts, and we hold the evidence sufficient to sustain a verdict against it. Chubbuck v. Cleveland, 37 Minn. 466, 35 N. W. 362, 5 Am.

St. Rep. 864; Wilson v. Green, 25 Vt. 450, 60 Am. Dec. 281; Stoney Creek Co. v. Smalley, 111 Mich. 321, 69 N. W. 722; Wells v. Western Union Tel. Co., 144 Iowa, 605, 123 N. W. 371, 24 L. R. A. (N. S.) 1045, 138 Am. St. Rep. 317.

[5] The eighth assignment is overruled. Misjoinder of causes of action would not authorize a verdict against plaintiff on the merits. If presented by plea in abatement, and same was sustained, the plaintiff would be required to dismiss to the extent necessary to cure the objection, and, if presented in connection with a plea of privilege, the sustaining thereof would only require a transfer of the case to the court of the county in which the venue should have been laid.

[6] The ninth and tenth assignments complain of the giving of special charges at the request of the Railroad Company, in regard to the Railway Company's plea for recovery over against Compress Company. One was a peremptory charge directing that, if the jury found against the Railroad Company, then to find for Railway Company over against Compress Company for same amount. The other was more liberal to Compress Company.

The eleventh assignment complains of the eighth paragraph of the main charge, also on Railway Company's plea for recovery over against the Compress Company which allowed such recovery upon finding certain facts.

If the court erred in giving the peremptory charge, this case will have to be reversed as between the parties, as the other charges could not cure such error. If it did not err in giving the peremptory instruction, then the other charges are harmless as against the Compress Company.

We are of the opinion that the peremptory instruction was authorized. The evidence is conflicting as to whether Leech, an agent of Railway Company, had knowledge of the split condition of the cotton at the time he checked same, after it was loaded. In passing on the correctness of a peremptory instruction, we must take as true the evidence most favorable to the party against whom such instruction is given, and therefore must consider this question upon the theory that Leech had such knowledge. In pursuance of his duties, after counting the bales in the cars, he made a "blind check" of the number of bales in each car and took same to the office of the Compress Company, and compared same with the loading slips furnished by said company, and, finding such slips correct, he signed the name of F. E. McKay, agent for the Railway Company, to same, then gave the originals back to the Compress Company and delivered the duplicates at the freight office of the Railway Company. These slips were issued after the cotton was loaded, and are dated March 16, 1910. Such slips were referred to in making out the waybills, which were dated March 17, 1910; but the bills of lading, while dated March 14, 1910, were in fact signed March 16, 1910, upon the faith of receipts issued by the Compress Company to the effect that it had received the stipulated number of bales from G. Alexander, which receipts were attached to said bills of lading at the time same were presented to the agent of the Railway Company for signature. The loading slips had not been brought to the railway's office at the time the bills of lading were issued, and the employé who signed McKay's name to the bills of lading testified positively that at the time he signed the bills of lading he had nothing except the said bills of lading and the compress O. K.'s. However, if Leech had knowledge that half bales were being shipped and had disclosed such knowledge by marking the loading slips to that effect, the Railway Company would have had a chance to have avoided damage by notifying Moody & Co. of that fact. While this is true, we fail to see how the negligent or willful failure of an employé to communicate to his employer knowledge of a fraud being perpetuated by an agent of such employer (if Compress Company be considered as the agent of the Railway Company), or by a contractor (if Compress Company be considered, as between it and Railway Company, to be merely a contractor), should excuse such agent or contractor from liability for such fraud. Having set the fraudulent agencies in motion, it cannot excuse itself from the consequences by saying that an employé was negligent or guilty of fraud in not apprising his employer of the fraud being perpetrated. We overrule the assignment.

The twelfth and thirteenth assignments are overruled.

The fourteenth assignment is overruled. We see no error in the definition of notice, and when notice becomes knowledge.

The fifteenth and sixteenth assignments complain of paragraphs of the charge wherein, if they find for plaintiffs, they are told what to take into consideration in arriving at the amount. The charges state the correct rule as we understand it. The omission to require a credit of $2,975 would not be affirmative error, and such question properly arises under other assignments, and will be disposed of under the same.

[7, 8] The seventeenth assignment complains of the verdict of the jury as being in disregard of a special charge given at the request of the Compress Company to allow a credit for $2,975 collected from Alexandre, if it found against the Compress Company and also should not allow plaintiffs any commission for selling the cotton. We think their commission was a legitimate item of expense. They were entitled to what their services were reasonably worth in a necessary and reasonable effort to minimize the dam-

ages. As to the item of $2,975: It appears from the agreement contained in the record that said amount was saved by the efforts of plaintiffs and the First National Bank out of funds received by said bank in payment of the draft for the other 315 bales of cotton, and that in a case involving the loss suffered by plaintiffs on account of said draft which was attached to bill of lading for the other 315 bales of cotton, out of the 800 split by this appellant, and in which suit all parties to this suit are parties, besides said First National Bank of Bowie, the plaintiffs concede said amount, less the expense of collecting it, as a credit to be given the defendants in said suit. We do not think appellant was entitled to have said amount credited upon plaintiffs' claim in this suit, nor did the jury allow such credit. Under the general charge of the court these credits of $2,975 and $485 were not required to be allowed, but under the special charge the jury was told to allow same. The special charge being offered by this appellant, and being erroneous, it cannot be heard to say that the verdict is wrongful because the jury did not follow such erroneous charge and decided the issues in accordance with the general charge of the court. The assignment is therefore overruled. I. & G. N. Ry. Co. v. Parish, 18 Tex. Civ. App. 130, 43 S. W. 1066; Gooch v. Addison, 13 Tex. Civ. App. 76, 35 S. W. 83.

The nineteenth and twentieth assignments complain of the refusal of special charges offered by this defendant. Charge No. 9 placed too great a burden upon plaintiffs, while the latter part of No. 10 is misleading and too restrictive in requiring knowledge on the part of Trueblood when either knowledge or notice would be sufficient. The assignments are overruled.

[9] The twenty-first assignment complains of the refusal to give the following special charge: "You are instructed that the evidence fails to show any conspiracy or agreement between the City National Bank of Bowie, Tex., or any of its officers or agents, with the defendant Compress Company, or any of its officers or agents, and you are therefore instructed that you must not consider for any purpose, as against the defendant Compress Company, any testimony introduced which you may believe shows, or tends to show, any liability on the part of said Bank, but such testimony, if any, will be considered only between the plaintiff and said Bank." The court did not err in this matter because this special charge was too general. There was evidence in the case, for instance the bills of lading, which could legitimately be considered against both parties.

[10] By this charge the jury was called upon to pass its judgment on the admissibility of the evidence as against the two parties mentioned in this charge.

The twenty-fourth assignment is overruled for the reasons given in passing on the fifth assignment.

The twenty-fifth and twenty-sixth assignments are overruled for the reasons given in discussing assignment No. 17.

[11] Assignment 27 complains of certain communications between the court and jury, in writing, after the retirement of the jury, and while it was in a jury room, opening out from the courtroom where the court was trying another case; the door of the jury room being in view of the court. The jury sent the following communication to the court: "Does paragraph 10 of your charge mean absolutely that if we find against all defendants we are obliged to find for the Railway Company against the Compress and the Bank? F. W. Yensen, Foreman." The judge wrote on the slip of paper: "Yes. E. B. Muse, Judge. Keep this." And the slip of paper was returned by the deputy sheriff to the jury. Afterwards, the foreman sent another slip of paper to the court containing the following: "If we allow interest, do we have to compute the interest? F. W. Yensen, Foreman." The judge wrote on it: "Not necessarily. E. B. Muse, Judge. Keep this." These slips were returned with the verdict and charges, but not filed until motion for rehearing was heard. Having held that the Railroad Company was entitled to a peremptory instruction against the Compress Company in case the jury found against all defendants, we fail to see how the Compress Company was prejudiced by the first question, nor could any injury have resulted from the second question and answer. However, under the authority of Railroad Co. v. Byrd, 102 Tex. 263, 115 S. W. 1163, 20 L. R. A. (N. S.) 429, 20 Ann. Cas. 137, the question is whether these acts of the court and jury violated the statute with respect to communications between the court and jury. While not approving the practice, yet we feel constrained to hold that the statute was substantially complied with, and overrule the assignment.

The seventh, eighteenth, twenty-second. and twenty-third assignments all are based upon the failure to sustain this appellant's plea of privilege, and upon the action of the court in rendering judgment overruling same, upon a verdict not disposing of the issue.

[12] We are of the opinion that all of these assignments should be overruled. It is a very doubtful question whether the Compress Company was ever in a position to urge its plea of privilege after filing its first pleading, which it styled "Original Answer," and which reads that for answer it says: (1) "The defendant excepts to the plaintiffs' petition and says the same is insufficient in law and shows upon its face no right of plaintiff to sue this defendant in Dallas county," etc. But even if the first part of this "answer" was not a demurrer, but a part of an exception asserting privilege, which is followed in

the second count by a plea of privilege, yet we think there was no evidence sufficient to raise an issue on the question whether the Railway Company was fraudulently joined in the suit for the purpose of procuring jurisdiction. As said Railway Company was properly sued in Dallas county and the cause of action against this appellant grew out of the same transaction, it was a proper party to the suit. Even though it were held that liability did not exist on the part of the Railway Company, such conclusion would not prove that it was fraudulently joined in the suit to procure jurisdiction. Railway v. Williams, 38 Tex. Civ. App. 405, 86 S. W. 38; Toland v. Sutherlin, 49 Tex. Civ. App. 538, 110 S. W. 487. The causes of action asserted against the Railway Company and the Compress Company are connected with each other so as to make it both desirable and proper that the same should be settled in the same suit. We are of the opinion that the court committed no error in overruling the plea of privilege without submitting any issue with respect to same to the jury.

We pass to the consideration of the questions presented in the brief of appellant Missouri, Kansas & Texas Railway Company of Texas.

The first assignment is as follows: "The verdict of the jury is contrary to the law and the evidence, in that the evidence shows beyond dispute that this defendant delivered to the plaintiffs all of the cotton actually received by it under the terms of the bill of lading, and that, if said bill of lading showed the receipt of more cotton than was actually delivered to plaintiffs, then this defendant never received the same, and the act of its agent in executing the bill of lading therefor was not binding on this defendant, and it is not estopped under the law to deny the recitations in said bill of lading, and for this reason the trial court erred in refusing this defendant a new trial, all of which appears in section 7 of its said motion." Three propositions are submitted: (1) That the bill of lading was not an instrument negotiable by the law merchant, and appellees, as assignees of same, were bound to allow all discounts and defenses that were good against their assignor, prior to the time appellant had notice of the assignment. (2) In so far as a bill of lading is a receipt for goods, it may be explained or varied by parol testimony. (3) A local freight agent of a railway company has no authority to issue a bill of lading for any goods except those actually delivered to him for shipment, and, even though the recitation in the bill of lading as to the amount of cotton received for shipment was substantially false and known to the said local freight agent to be false, yet the appellant had the right to show what was actually received by it under said bill of lading and that it delivered the goods actually received.

These propositions are submitted upon the theory that, even though the agent issuing the bill of lading had actual knowledge of the condition of the cotton, yet the Railway Company would not be liable. So far as we have been informed and have ascertained, this question has never been decided in Texas, and it is probable that it will not arise in any other cases than this and its companion case, as the Legislature, by the act approved September 13, 1910, relating to bills of lading, has provided that, when issued by the authorized agent, the bill of lading shall be deemed the act of the carrier, and the principal shall be liable thereon in accordance with its terms; also, that when available, authenticated, or certified in accordance with the rules therein provided for and those prescribed by the Railroad Commission in accordance with the provisions of said act, same shall, if in the hands of an innocent holder for value, be incontestible as to the matters and things therein set forth.

[13] The weight of authority in the United States is to the effect that, where no goods are in fact received by the carrier, a bill of lading reciting receipt of such goods is void even as to innocent purchasers for value; the reason given for the rule being that the agent has no authority to execute bill of lading until the goods are actually received, and therefore as between the parties to such instrument the same is a nullity, and, being nonnegotiable the assignee can obtain no greater right than the assignor had. See Hutchinson on Carriers, § 161. But, as is stated in the treatise just cited, "this rule has not been uniformly followed, and is opposed by courts of eminence and by reason of great cogency"; the doctrine announced by said courts, briefly stated, being, that under such circumstances the statement as to the receipt of the goods amounts to a representation by the carrier of a fact which was, or in the ordinary course of business ought to have been, within the knowledge of the agent, and that as to an innocent and bona fide holder of the bill of lading the carrier will be estopped from claiming that he did not receive the goods. Hutchinson on Carriers, § 161.

The rule just stated appeals to us as the correct rule to apply in this case. In the first place, the Railway Company has not sought by its pleading to deny the authority of its agent to issue the bill of lading in question, but is defending upon the theory that it was authorized to issue the bill of lading for 485 bales on estimated weights, because it was permitted to transport cotton without weighing same, and that it was guilty of no wrong or negligence in issuing the bills of lading.

[14] Plaintiffs' cause of action as against this appellant is based in part upon the bill of lading, and it would therefore appear that

under our statute want of authority on the part of its agent to execute same should be pleaded under oath.

Even though the question of authority was in this case, yet it would present a very strong case for the application of the doctrine of estoppel. The bill of lading contained the following provision: "This bill of lading is not negotiable unless the freight covered by it is consigned to shipper's order and is properly indorsed and surrendered upon delivery of the cotton herein receipted for." It also recited: "Consigned to shipper's order, notify W. L. Moody & Company; destination Galveston, Texas; number of bales 485." The evidence shows that the bill of lading was duly indorsed by G. Alexandre and by W. L. Moody & Co.; that upon the faith of its representations Moody & Co., paid the draft before the arrival of the cotton in Galveston, as was the usual custom in the cotton business with respect to drafts attached to bills of lading to shipper's order. It was shown that the term "bale of cotton" has a definite meaning in the cotton business; that it means a merchantable bale weighing approximately 500 pounds; that the term "estimated" as used in describing cotton in bills of lading means that the cotton is considered as weighing 560 pounds; that Moody & Co. so understood and interpreted said recitals. It was also shown that the general custom and practice as to handling the cotton business, financing the crop, and moving it to market, was for the owner to deliver his cotton to the carrier and secure shipper's order bill of lading therefor, and make draft on purchaser at destination; that banks and others will generally advance to the shipper the cash called for in the draft, and thus such draft with bill of lading attached will make its way through the exchange centers to destination. Instead of delivering 485 bales of cotton called for by this bill of lading, 485 half bales were delivered.

It was the necessary expectation of this appellant, in issuing such bill of lading, that a business transaction would be consummated upon the faith of same with W. L. Moody & Co., said firm being mentioned therein, and that said transaction would probably include advances made upon the faith of such bill of lading. Article 322, Revised Statutes, required carriers to state in a bill of lading the quantity, character, order, and condition of the goods. We are of the opinion that, under the facts of this case, this applicant is estopped to deny that it received the 485 bales of cotton as said term was used and understood among those dealing in and handling cotton, viz., of the approximate weight of 500 pounds. Nor do we believe that this holding is at all inconsistent with that of our Supreme Court in the case of Stamford Compress Co. v. Bank, 143 S. W. 1142. In that case it is held

that where a nonnegotiable receipt is issued, it is the duty of the purchaser thereof to notify the party issuing such receipt of such purchase, otherwise said party will not be liable for delivering the goods to the person to whom the receipt was issued upon a reasonable explanation for not presenting such receipt. The receipt in that case was expressly by its terms made nonnegotiable and did not even contain an implied promise that the goods would be held for the bearer of the receipt. We think the opinion in that case has no bearing on the question of the effect of a false representation in a nonnegotiable receipt, when acted upon by a bona fide purchaser for value. The assignment is overruled.

[15] The second, third, fourth, and fifth assignments are considered together, being based upon the contention that there was no evidence to sustain a finding that there was a material difference between the recitation in the bill of lading and the cotton actually received. The evidence was ample to show that the term "bale of cotton" has a well-defined meaning; in fact, so much so that this appellant's agent admitted that he would not knowingly issue bills of lading for bales of cotton when only half bales had been delivered to the Railroad Company. Said assignments are all overruled.

[16] The sixth assignment attacks the evidence as insufficient on the ground that appellant's agent at the time he executed the bill of lading had no knowledge or notice that the recitation in the bill of lading was untrue.

The Compress Company, which split the bales of cotton and issued a false receipt to the shipper and executed false loading slips to the appellant, was under contract with this appellant to load cotton received by the railroad at the platform of the Compress Company. It was paid for this service, and none of the employés of the Railroad Company had anything to do with the loading. The Compress Company loaded this particular cotton. None of this appellant's employés, whose duty it was to sign bills of lading, had any actual knowledge or notice of the fact that said cotton was half bales, at the time said bills of lading were issued. There is evidence that Leech, an employé of this appellant, whose duty it was to check the cotton after bills of lading were issued, and see that the loading slips were correct as prepared by Compress Company, had knowledge of the condition of the cotton when he checked same, and also that he had knowledge on the day previous to the issuance of the bill of lading that this cotton was being split.

We are of the opinion that the evidence sustains a finding that the Compress Company was the agent of the Railroad Company in receiving and loading the cotton. Arthur v. Railway Co., 204 U. S. 505, 27 Sup. Ct. 338, 51 L. Ed. 590; Railway v. Edwards, 56

Tex. Civ. App. 643, 121 S. W. 570. Through said agent this appellant had knowledge that it had received and loaded half bales of cotton instead of bales.

The assignments are overruled.

The seventh assignment complains that the verdict is contrary to the undisputed evidence in that same shows that plaintiffs' agent, Barden, when he paid the draft, acted on the faith of the notice of the shipment from Alexander as to weights and grades, and did not depend upon the recitation in the bill of lading on the question of weight. The eighth assignment charges plaintiffs with being guilty of contributory negligence in paying the draft. The evidence was sufficient to sustain a finding against appellant on these issues. We overrule these assignments.

The ninth assignment complains of the refusal to give a peremptory instruction for this appellant. The assignments questioning sufficiency of the evidence to support the verdict having been overruled, it follows that this assignment must be overruled.

The tenth assignment complains of the first paragraph of the charge. The propositions embodying the objections to such paragraph are virtually: (1) That there is no evidence to support the submission of the issue of material misrepresentation in the bill of lading; (2) there was no evidence to support the issue that appellee believed from the recitations of said bill that the bales of cotton weighed approximately 500 pounds each. As we cannot agree to either contention, we overrule the assignment.

Assignment No. 11 (1) complains of paragraph 3 of the court's charge. The first three propositions are the same as those submitted under the first assignment. We find no merit in any of the other propositions except the seventh, which asserts that the charge is without evidence to support it in so far as it submits the issue whether the witness Leech checked the cotton for the purpose of ascertaining the amount upon which to issue a bill of lading. The undisputed evidence shows that the checking by Leech was not for the purpose of having a bill of lading predicated upon the loading slips; the bill having been issued prior to the checking of the cotton by Leech, upon the faith of the certificate issued by the Compress Company to the shipper. This issue was merely upon the question of whether this appellant had notice, at the time it issued the bill of lading, of the fact that the bales were split, and as we view the case the court could have peremptorily instructed that the Compress Company was the agent of the Railroad Company to receive and load this cotton, and that through such agent it had knowledge that half bales were being loaded. We therefore conclude that this error was harmless.

Assignments 11 (2) and 12 complain of the refusal to give special charges, both relating to the knowledge of the witness Leech, under which propositions are asserted to the effect that, it being the duty of Leech to check the cotton after bills of lading issued, the knowledge obtained in checking the cotton is not chargeable to the Railroad Company in the matter of issuing the bill of lading. These charges only relate to knowledge, and the refusal of same, as drawn, if error, was harmless in view of the fact that it is undisputed that the Railroad Company had knowledge through its agent, the Compress Company, at the time it issued the bills of lading.

The fourteenth assignment complains that the verdict is excessive in not allowing credit for $2,975 realized by plaintiffs from Alexander. This assignment is overruled for reasons given in discussing assignment No. 17 of the Compress Company.

The thirteenth and fifteenth assignments are overruled for reasons given in discussing a similar assignment submitted by the Compress Company.

[17] The sixteenth assignment complains because of conflict between the charge of the court and special charges given. This conflict, in so far as it relates to the issue between plaintiffs and this appellant, was caused by the giving of special charges offered by this appellant, which we hold were not correct. This being the case, appellant cannot complain of the conflict, as the special charges were much more favorable than it was entitled to have given and it could not have been injured by the repugnancy. I. & G. N. Ry. Co. v. Parish, 18 Tex. Civ. App. 130, 43 S. W. 1066; Gooch v. Addison, 13 Tex. Civ. App. 76–83, 35 S. W. 83. The assignment is overruled.

The seventeenth assignment is overruled.

[18] The eighteenth assignment complains of the admission of the testimony of the witness Zeigler as to class, grade, and value of the 800 bales of cotton, over the objection that he testified solely from examination of samples and that same had not been sufficiently identified. Mitchell, superintendent of press at Moody Compress, testified to the sending of samples from same up to Moody's office, which were never brought back; that their sample man took all the samples from the compress. Zeigler, who classed all cotton for Moody & Co., testified that the samples came to their office in the regular course from the compress. The sample man did not testify and identify the samples received by Zeigler with those delivered to him by the Compress Company. However, the evidence shows further that when samples are sent out by the compress a number and mark is placed on same, the same mark as shows on expense bill, and that a receipt accompanies such samples. The samples are then checked with the compress receipt to see that they are all there. We think this evidence was sufficient to identify the samples, and overrule the assignment.

[19] The nineteenth assignment complains of the admission of the testimony of Trueblood, to the effect that defendant Hudspeth told him that the railroad would haul the 38 bales on estimated weights, that he had spoken to the railroad about it, and to call up its office. By special charge this evidence was withdrawn from the consideration of the jury as against this appellant. As this testimony was admissible against Hudspeth, and the court, instead of limiting it when admitted, did so afterwards, we are of the opinion no harm could have resulted to the appellant, and overrule the assignment.

The twentieth, twenty-first, and twenty-second assignments are sustained for the reasons given in sustaining Compress Company's first assignment.

[20] The twenty-third assignment is overruled. The special charge requested was misleading, and would have excluded from the jury legitimate evidence, for instance the acts of Moody & Co. with reference to the cotton after receiving same. If contention is sought to be made that a special charge, though erroneous, is sufficient to call the court's attention to the matter so as to require a correct charge to be given, such contention should be asserted under an assignment of error to that effect. Parlin & Orendorff Co. v. Miller, 25 Tex. Civ. App. 190, 60 S. W. 881; Clevenger v. Blount, 114 S. W. 868; El Paso Ry. Co. v. Kendall, 38 Tex. Civ. App. 221, 85 S. W. 61.

The twenty-fourth assignment is sustained for the reasons given in sustaining Compress Company's assignment No. 2.

We will next consider the appeal of the City National Bank of Bowie.

The assignments complaining because of the overruling of this appellant's plea of privilege are overruled for the reasons given in passing on similar assignments presented by the Compress Company.

The only issue submitted by the court upon the liability of the Bank was in the following portion of the charge: "If you find in favor of plaintiffs the issues set forth in paragraph 1 of this charge, and if you further find that the defendant City National Bank of Bowie, at the time it credited the account of Hudspeth, Alexandre & Co. with the amount paid by plaintiffs on the draft drawn on plaintiffs, had notice or knowledge that such payment had been fraudulently procured to be made by G. Alexandre or some one acting with or for him, you will find for plaintiffs against said City National Bank of Bowie. By 'notice' as used herein and also elsewhere in this charge is meant knowledge of such facts as would have put a reasonably prudent person upon inquiry to ascertain the complete facts, and where such inquiry, if pursued as same would ordinarily be pursued by an ordinarily prudent person under similar circumstances, would have disclosed the true facts, such notice is equivalent to actual knowledge. But if you find

that such Bank had neither notice nor knowledge of such fraud, you will find in favor of such Bank." The charge was prepared by appellant's counsel.

This appellant by its sixteenth assignment complains of the refusal of the court to give its requested peremptory instruction to return a verdict in its favor. Various propositions are submitted, but it may be briefly stated that the contention is made that the evidence shows the usual transaction between a bank and debtors in which a draft was collected and the proceeds, with the consent of the debtor, applied to the payment of the debt due, and that, no notice being had by the bank of the fraud through which the payment was procured, it is not required to repay such funds to the injured parties.

In connection with one of the propositions stress is laid upon the claim that this appellant had 529 cotton tickets to secure its debt, but gave some up, at plaintiffs' request, to enable Hudspeth, Alexander & Co. to make shipment; but, after all, the question under the charge of the court is one merely of notice, regardless of preceding transactions.

[21] We deem it appropriate to first take up and consider the evidence with regard to its sufficiency to sustain the judgment of the court, upon the issue submitted to the jury, viz., whether this appellant, at the time it applied the proceeds of the draft to the payment of its overdraft and gave Hudspeth, Alexander & Co. credit for the remainder, had knowledge or notice of the fraud perpetrated upon appellees.

The head bookkeeper, the cashier, and assistant cashier of this appellant all testified positively that these drafts were received, collected, and proceeds applied without any knowledge or notice that the bills of lading were not in fact for bales of cotton, and deny all knowledge or notice of any fraudulent intent on the part of Hudspeth or Alexandre. Appellees contend there are various circumstances which, taken together, disprove the assertions of the officials of the bank, and we will now consider each of the contentions made by them.

Appellees charge that this appellant did not have cotton tickets for 529 bales of cotton, notwithstanding its assertion that it did. The positive testimony of the cashier, the assistant cashier, and Teel, agent of Hudspeth, Alexandre & Co., is to the effect that there were 529 tickets in the possession of this appellant. Riggins, the head bookkeeper, did not know how many, but knew there were hundreds. In addition, Hutt, the bank examiner, testified that on February 12, 1910, he made a special examination of the cotton account of Hudspeth, Alexandre & Co.; that it was well and satisfactorily secured by cotton tickets. To show that this appellant did not have said number of tickets, appellees cite the following testimony: The witness Thomas testified that the First National

Bank of Bowie had 106 tickets, and that same were procured from said bank at about the same time as the tickets were procured from this appellant. This would make 635 tickets claimed to have been held by the two banks. Only 438 bales were used in making the shipment to Moody, and appellees say that the fact that one car contained only 38 bales is a strong indication that this was the last of the cotton owned by said firm, which would leave 197 bales not accounted for. It appears, however, that the tickets were delivered to Teel by this appellant on Sunday morning. The evidence shows that this must have been on the morning of the 13th as Riggins, chief bookkeeper for appellant, in giving the amount of overdraft by said firm, gives same on March 12th and March 14th and says the 13th must have been Sunday. All the testimony shows that the tickets were procured from this appellant several days before bills of lading were returned, which date is fixed beyond dispute as the 16th, because the railroad records so show it and the draft was paid at Galveston on the 17th, so the bills must have been in the hands of the bank on the 16th. It appears that on the 12th of March the overdraft was $50,858, on the 14th $53,140.14, on the 15th $44,696.17, and on the 16th $25,624.66. On the 15th credits of $6,746.51 for 90 bales, $1,935 for 43 bales, and $10,395 for 189 bales, all sold to Whaley, were turned into the Bank; the one for $6,746.51 being check by Coates to Whaley. The fact that credit was given Whaley for 322 bales after the 13th does not mean, according to the testimony of Ayers, that the tickets were not changed from Hudspeth, Alexander to Whaley until that time. When notified by Whaley that he had bought a certain number of bales from Hudspeth, Alexander & Co., they would take that number of tickets out of the latter's box and place a label on same bearing name of Hudspeth, Alexandre & Co. and make a delivery thereof by placing them to the credit of Whaley & Co., but same would not be actually delivered to Whaley & Co. until the transaction was closed by the giving of credit to Hudspeth, Alexander & Co. for the money. As we understand the testimony of Ayers, the tickets for the 90 bales and 43 bales were actually given up to Whaley on March 15th, and he gave them to Coates, and those for 189 bales were given up on the 16th. If it were conceded that these 322 tickets came out of the 529, then, with the number which appellees concede might have been shipped to Moody & Co. out of the amount held by the Bank, there would have been 654 on hand on the 13th; but according to the witnesses the bales sold Whaley are not to be taken into account.

It appears from the Compress books, as testified to by Trueblood, that, after shipping the cotton to Moody & Co., Hudspeth, Alexandre & Co. still had 697 bales in their name left with such Compress Company. The cotton remaining at the compress was shipped out by other parties after the Moody cotton, and, granting that all the tickets for same were disposed of by Hudspeth, Alexandre & Co. prior to shipping the Moody cotton, still there is no evidence to show that said tickets were not disposed of by them between the 12th and the 16th.

Appellees say that the only banks Hudspeth, Alexandre & Co. did business with were the two Bowie banks, but the portion of the record referred to by them contains testimony as follows: "I do not know whether they did business with another bank or not. I suppose other banks held their cotton tickets, or collateral tickets. I never heard of their doing any business elsewhere than with the First National and the City National Bank of Bowie." The witness Ayers testified: "Hudspeth, Alexander & Co. were doing business all over that country, paying for cotton. I don't know whether I could tell you what banks they did business with or not." Also, "They bought cotton all over that country and paid for it through various banks." We cannot agree that the testimony shows that said firm only did business with the two banks at Bowie.

Again, appellees, assuming that the 106 bales held by the other bank went into this Moody shipment, and thereby reducing the amount of cotton held by this appellant which actually went into the shipment of 332 bales, say that the remaining 197 bales, which such presumption leaves this bank claiming to have held, could not have been acquired by this bank as well as a margin of $3,068.44, because the bank was furnished no margin in cotton over its advancements. The testimony is to the effect that this appellant extended Hudspeth, Alexandre & Co. credit upon cotton tickets as security, that if they bought from a local man he would bring draft with tickets attached, and if from a person at another place he would ship cotton to this firm with bill of lading attached, and this bank upon approval of draft would take it up and hold the cotton as security. Riggins, in speaking of a credit of $3,180.80 given said firm, stated: "That is the only deposit I can remember that they made with our bank during the time they did business with us except the amounts our bank had loaned them and items paid out by us for cotton bought by them." This testimony indicates they not only advanced money to buy cotton, but loaned money, presumably on cotton tickets procured through purchases consummated through other sources. The evidence also shows that this appellant did business with a number of other cotton firms in the same way, also that Hudspeth, Alexandre & Co. were indebted to this bank, on January 1, 1910, in the sum of over $100,000, and up to March 14, 1910, in the sum of over $50,000.

Riggins testified that none of their cotton accounts had ever put up a margin. After-

wards he qualified this by saying that he had stated that none of them put up a margin in the beginning of the business.

Unless a margin was put up in making loans, or grew by reason of advances in cotton, it is inconceivable how the bank examiner would have approved this account for the heavy indebtedness due on February 10, 1910.

Ayers testified the Bank did not have any cotton classed but cotton such as they understood this to be worth $70 to $75 per bale. He also testified that he knew that 563 bales of the cotton shipped from Bowie to Wichita Falls was not "bollies," and was worth $70 to $75 a bale, but that they did have 43 bales of "bolly" cotton that he knew of. He did not know how much of the cotton held by them was in fact shipped to Moody & Co. The cotton received by appellees averaged about $60 per bale. Some of the cotton sold Whaley averaged $45, some $55, and some $75, so it appears that widely different prices must have been paid out for cotton by Hudspeth, Alexandre & Co.

Under appellees' theory the margin of $3,068.44 should not be urged by them, because they assume to start in on that this appellant, in order to get the sum necessary to make such margin, got the benefit of 106 bales taken from the other bank.

Appellees also assert that Teel, the agent of Hudspeth, Alexandre & Co. who got the tickets from this appellant, made contradictory statements concerning the number of tickets he got. According to the testimony of said witness, which appears to be substantiated by the question quoted from the statement he had made, he understood such questions to relate to how many bales of cotton Hudspeth, Alexandre & Co. had on hand just before closing, by which he meant when they paid him off, which was after Hudspeth and Alexandre returned from Wichita Falls. He testifies positively they did not ask him how many tickets he got, but how many bales said firm had, and he could not say definitely at the time.

It appears that this appellant kept no book or list showing the amounts of cotton tickets he held, and that Boedecker, its president, and Ayers, cashier, and Hutcheson, assistant cashier, all remembered the number of tickets. Hutcheson said he counted the tickets on Saturday night and knows there were 529. Ayers testified they, counted the tickets of all parties Saturday night; that Hudspeth, Alexander & Co. had 529 tickets; that he and Hutcheson were in the Bank Sunday morning, and when Teel called for the tickets both Hutcheson and Teel counted them; while Boedecker's testimony is that he had those tickets counted before him before he went to South Texas, and he had it upon his memory that they had 529 tickets. His testimony would not be entitled to much weight on this point, as it leaves the impression that while believing, as he says, that

the tickets, when he had them counted, numbered, 529, yet that he might be mistaken about it. He could not tell how many tickets there were in any other account. He testified he was in South Texas at the time the Moody drafts were drawn, also that he did not know how long it was before he left for South Texas when he saw the tickets counted. It will thus be seen that the record only shows that Ayers and Hutcheson testified with regard to the number of tickets on Saturday night, and the fact that they on the next day closed out said account and counted the tickets would impress upon their minds the number of these tickets, so that they would remember the same when the fraud was discovered a week or so later. However, it is not to be expected that at the date of the trial they would remember the number of tickets any other cotton man had on that Saturday night; there being no such facts to impress the same upon their minds. There was nothing about this testimony in regard to counting the tickets to justify a suspicion that it was false.

Appellees contend further that Hudspeth, Alexander & Co. did not dissolve partnership on November 1, 1909, as claimed by the Bank, and that the evidence of dissolution was fabricated at or after the time of cashing the draft on Moody & Co. so as to support the offset of the Moody & Co. funds paid Alexandre against the overdraft of Hudspeth, Alexandre & Co. on the books of the Bank, and so as to aid Hudspeth in the criminal case; that the close association between Hudspeth and the Bank before and after the fraud warrants this conclusion.

It appears that the dealings with all parties were conducted in the name of Hudspeth, Alexandre & Co., and Trueblood testified that as late as March 14, 1910, Hudspeth denied that he had dissolved partnership with Alexander. The verdict of the jury must be construed as finding that there was a firm at the time the cotton was shipped.

Upon the ledger of this bank, under date of November 1, 1910, appears the notation in Ayers' handwriting of the following words, "G. Alexander from here on," which was the only entry on said account in his handwriting. A dissolution contract was produced, purporting to have been executed by the parties, acknowledged before Ayers, who testified they brought it to the Bank, and he saw Alexandre sign the same, and that he requested Hutcheson to write a guaranty agreement. Hutcheson testified he knew of the dissolution, and that he wrote the guaranty agreement dated November 1, 1909, signed by Hudspeth, and acknowledged before the witness. Appellees say this guaranty contained recitals and special provisions indicating it was not prepared pursuant to a book form, as testified to by Hutcheson; but we are not referred to the page of the record where we are to find the in-

formation. The effect of the instrument is stated in Hutcheson's testimony and the fact of its introduction in evidence recited; but we do not find a copy of the instrument, although in the testimony of the same witness we find the dissolution copied, with the signatures; that of Alexandre being written Alexander. The witness Hutcheson testified the signature to the dissolution agreement looked like Alexandree, while his signature to checks was Alexandre. The witness referred to the checks in testifying; but he does not appear to have been asked whether the signature to the dissolution agreement appeared to be in the same handwriting as that to the checks, nor are we referred to any other evidence tending to prove that such signature was not in Alexandre's handwriting. The dissolution agreement contained a provision that Hudspeth was to work for Alexandre until March 1, 1910, at $200 per month, and at that time was to receive $6,000 in addition to $2,000, receipt of which was then acknowledged. The guaranty agreement made Hudspeth responsible for the account of the firm as it stood at the time, also for the account of G. Alexander after the dissolution.

The bank examiner's testimony on this point, after stating he looked at the accounts shown him, is as follows: "Of course, I looked at them if I made an examination of the bank. I may not have gone back here several months. I could not undertake to say whether the notation on the bank books to the effect that 'Alexander from here on' was there when I examined it. I don't remember."

Ayers testified he made the notation at the time he took Alexandre's acknowledgment. Riggins testified about the notation being in Ayers' handwriting, but was not asked about his knowledge of the dissolution and the making of the notation. However, this is accounted for by the fact that he testified by depositions.

While this testimony shows a peculiar and unusual transaction, we are not prepared to say that it shows that the bank fabricated testimony. Hudspeth and Alexandre may have made these agreements, and for that matter may have subsequently entered into others making them partners. So far as this bank is concerned, it appears immaterial whether they were partners or whether Hudspeth was merely the guarantor of Alexandre. In either event both would be liable for the debt. The cotton belonged to Hudspeth, Alexandre & Co., and, if Alexandre alone was doing business in that name, it belonged to him and the debt was due by him. If no dissolution had taken place, it belonged to both, and the record shows that Hudspeth, Alexandre & Co. authorized the proceeds of the draft to be applied to the satisfaction of the debt. However, if it be said that no dissolution ever took place and

that the express authorization of the firm could not affect the property rights inuring to Alexandre individually, then we say that the evidence shows that the cotton tickets were obtained on the faith of the bills of lading being brought, and Alexandre by bringing the drafts and bills of lading to the bank and agreeing to look up the six bales not accounted for agreed that such drafts were for cotton liable for the debt under the agreement by which the tickets were procured, and by his conduct authorized the proceeds to be applied to such debt.

The other theory advanced is that this appellant fabricated this testimony to assist Hudspeth in a criminal case, because the relations between them had always been close. We fail to see how this would assist Hudspeth, in the face of the positive testimony of active participation in the fraud.

Again, appellees say that: "The facts proved and the conduct of the Bank showed either its participation in or knowledge of the fraud, or of facts that put it under the duty of making inquiry. Trueblood says no secret was made of the splitting of the cotton, and therefore inquiry of him would have disclosed the facts."

Wichita Falls is about 60 miles from Bowie, so it cannot be presumed that the officers and employés of the Bank would know what was going on there; nor have we seen anything in the transaction of getting the tickets from them which would cause them to suspect that the cotton would be split, so as to require them to make inquiry; nor was there anything in the bills of lading to put them upon inquiry.

In addition to the matters already discussed, appellees make the following statements in support of the contention that the evidence shows participation in the fraud or knowledge thereof:

(1) That this appellant now admits it regarded the character and credit of Alexandre to be poor when the Moody & Co. deal was on; but to Barden it represented the contrary.

Barden, for appellees, had a conversation with Ayers by telephone, and their versions were contradictory except upon one point, and that was that Ayers stated their business with Alexander had been satisfactory, which statement has not been proved false. Barden testified that he stated they had a telegram from Alexandre asking how much he could draw against a consignment of 800 bales of early cotton, and asked if Alexander was a customer of the Bank, and that Ayers said he was; that he then asked if Ayers had a good opinion of Alexander, and Ayers said he had, and then he asked if Ayers thought they could rely upon the cotton being as Alexander described it to be, and he again answered, "Yes." The only purpose for which this testimony might be admis-

sible against this appellant would be to show notice of an intended fraud, but there is nothing in it which would acquaint Ayers with knowledge or notice that 800 bales of cotton would be made out of 400; there is no evidence even that Ayers did not believe that Alexandre had or could acquire the cotton described. Appellees knew this was not a guaranty by the Bank, and were further notified by the stamped indorsement on bills of lading and draft that the Bank made no guaranty.

(2) That appellant knew Hudspeth and Alexandre were both insolvent, and were unwilling to risk them itself, but was willing for Moody & Co. to take the risk.

We fail to find the evidence of knowledge of insolvency. The portion of the testimony of Ayers referred to discloses that he knew of no property owned by them except their cotton accounts, that the drafts were received for collection, and credit was not given for same until collected for the reasons stated by him in the following language: "They said they were going to close up and wasn't going to buy any more cotton, and they had taken our collateral, and we're not going to give them credit and let them take it out. If we had simply credited it against the overdraft, they might have checked it out. Oh, we might have been able to keep them from checking it out, but it would have been a difficult thing to do." He also testified that ordinarily they gave said firm credit at once. He only knew one instance in which they entered a draft for collection, and he thought that was done after the draft had been returned, the cotton having been diverted and shipped elsewhere, in which instance they got credit when the draft was finally paid. He also testified they had taken plenty of drafts for people in that way, meaning for collection. So far as risk was concerned, the Bank for three days had risked said firm with all its security. The surplus above the amount of the overdraft could have been checked out, and, if Moody & Co. refused to pay the draft, this Bank would have had its claim against said firm increased to that extent, with the same security it had when it took the draft for collection. This was no great risk to take, but the mere failure to give immediate credit is not sufficient to show knowledge of fraud in the transaction.

(3) That it associated with Hudspeth in the joint defense of this suit, finding no conflict of interest between Hudspeth and the Bank.

It appears that, after Hudspeth employed Mr. Chanceller to represent him, this appellant employed him; that there were two law firms in Bowie with which this Bank did business, one of which was employed by plaintiffs, and Mr. Chanceller was a member of the other firm. This appellant afterwards employed additional attorneys. The Bank would be entitled to recovery over against Hudspeth if a judgment be rendered against it, and therefore its interests conflicted with those of Hudspeth; however, if Hudspeth conceded his liability over, his attorney might see no impropriety in representing the Bank. It was certainly not the part of wisdom on the part of this appellant to employ an attorney to represent it before a jury when such attorney was also representing Hudspeth, whose conduct was indefensible. In view of the fact that the layman frequently does not understand the improprieties which to an attorney are obvious, it would be unjust to hold this as a circumstance against the appellant in this case.

(4) That this appellant had all of its officials at the Bank on Sunday morning, and, having counted the cotton tickets, gave them to Teel so that the Moody & Co. contract could be filled.

The record shows merely that Ayers and Hutcheson were at the Bank on Sunday morning; that Teel came there for the tickets, and Hutcheson and Teel counted them.

(5) That the Bank knew the cotton belonged to Hudspeth, Alexandre & Co. and authorized Alexandre to sell it in his own name.

It was entirely immaterial to the Bank in whose name the cotton was shipped, and the record does not show anything further than that the Bank did not object to the bills of lading being made to Alexandre.

(6) That the Bank asked for wired returns on the collection and credited the proceeds on receipt of such information, thereby enabling Alexander and Hudspeth to close out their business at Bowie on or before March 19th and escape before the cotton could reach Galveston.

At the request of Alexandre, who attached to the draft a slip asking for returns by wire, the Bank made such request, which was not unusual. There was nothing in the request to excite the suspicion of the Bank, nor anything wrong in the Bank granting the request or crediting the amount upon receipt of the notice of payment.

(7) That no surprise was manifested when Graham gave information concerning the fraud.

In support of this statement, we are referred only to Ayers' testimony, in which we find the following statements: "I don't remember the conversation that we had. I remember that we talked about the cotton being split, and it struck me so dumbfounded I don't remember whether there was anything else said over there or not. * * * He talked to me about splitting the bales. It looked like he kind of had it in for me, and it was such a surprise to me that I don't know what they asked me. * * * I could not tell you when I got over my surprise. I judge, when we first talked about it there, I was very much surprised, like you would be or anybody else." The testimony of the witness is also that some one had told him that

Graham was in Bowie looking for Alexandre, that the cotton had been split, and that he then went to see Graham; he thought Allen had told him. Graham admitted he had told Allen before Ayers saw him. Graham did not testify whether or not Ayers appeared surprised.

(8) That no effort was made to locate either Hudspeth or Alexandre to get explanations from them on learning of the fraud, though professing to believe that Hudspeth could explain.

We are again referred to Ayers' testimony, and find that he testified: "I did not make any effort to find Dow, who is A. D. Hudspeth. I may have walked down the street, and asked somebody where he was, or something to that effect. The day that Graham was there, if I had seen him, I would have told him to go up and see Graham, but would not have gone and looked for him." He also testified he did not remember telling Graham he would go and look for Hudspeth and get him to explain. Graham testified that Ayers said he would try to find Hudspeth for him.

(9) That Ayers warned Hudspeth's father a few days later of possible trouble.

The testimony shows that, after Graham was in Bowie, Hudspeth's father came in the Bank and Ayers told him there was a man looking for Alexandre on account of splitting some cotton, and that he was afraid Dow would get into trouble. He did not ask where Dow was, nor was he told where he was.

(10) That appellant's president, Boedecker, maintained an unconcerned and fully informed attitude upon his return to Bowie after the fraud, reaching there at night and finding peace officers and attorneys at the Bank going over its books; he knowing that the Hudspeth, Alexander matter was under investigation.

We are referred to the testimony of Boedecker and find nothing to justify the conclusion stated by appellees. He testified he came in from South Texas at night, and went to the Bank, as was his usual custom, and found Mr. Spear, attorney for appellees, and the county attorney there going over the books with some of the bookkeepers of the Bank; that he made inquiry of some one and was told that Hudspeth and Alexandre had been splitting cotton and both were gone. He did not suppose he asked why they were looking at the Bank's books, nor did he think he asked whether the Bank was concerned in it because he did not think it was; that they were going through the books to get information about the matter, but he did not know what kind of information they wanted. We see nothing in his testimony indicating that he knew of the Bank having engaged in any fraudulent enterprise. We conclude that the evidence does not justify us in sustaining the claim that the Bank had notice of the fraud at the time the bales were split or at the time of the crediting of the proceeds of the draft. The testimony of interested parties may be disregarded, though not directly contradicted; but there must be some basis for sustaining the rejection of the same, and in this case, in order to reject such testimony, there should be some facts or circumstances tending to show that the appellant had such notice; but, as we view the evidence, all of the same is consistent with the theory that the Bank did not have such notice. We are therefore of the opinion that the theory upon which the case was submitted to the jury is not supported by any evidence.

Appellees, in their reply brief, express a doubt regarding the correctness of the theory upon which this case was submitted, at their request, as against this appellant, and, in view of their contention that the Bank is liable for the funds received by it regardless of notice, we will briefly consider such question.

[22] We do not regard the fact that the Bank had 529 tickets as of any importance except on the question of good faith. True, it permitted them to be taken upon the faith of getting bills of lading for the same amount, and it accepted bills of lading calling for six less bales, but in fact covering only about half the number of bales. By means of the fraud perpetrated upon it, the Bank was led to believe it still had ample security for its debt, or rather that the security which it in fact had, as between it and its debtors, had been returned to it evidenced by different instruments. It cannot be said that it parted with its 525 bales upon the faith of the payment of the draft, as it parted with same before the draft was drawn. It was defrauded into accepting bills of lading for about 262½ bales of cotton in satisfaction of the obligation to return bills of lading for 529 bales. For the fraud thus perpetrated upon it by Hudspeth, Alexandre & Co. the appellees were not responsible, and the Bank's rights against appellees must be governed by what it did upon the faith of the acceptance and payment of the draft by appellees. If the draft had been purchased by this Bank, there would be no doubt of its right to hold the proceeds of the draft after its payment by appellees. Blaisdell v. Bank, 96 Tex. 626, 75 S. W. 292, 62 L. R. A. 968, 97 Am. St. Rep. 944; Bank v. Nigro & Co., 110 S. W. 536; Bank v. Railway Co., 133 S. W. 1099; Wilson Grain Co. v. Bank, 139 S. W. 999; Tolerton & Stetson Co. v. Bank, 112 Iowa, 706, 84 N. W. 930, 50 L. R. A. 778; Hall v. Keller, 64 Kan. 211, 67 Pac. 518, 62 L. R. A. 759, 91 Am. St. Rep. 209; Mason v. Nelson, 148 N. C. 492, 62 S. E. 625, 18 L. R. A. (N. S.) 1221, 128 Am. St. Rep. 635. However, in this case the draft is collected and the major portion of the proceeds applied to the payment of a pre-existing indebtedness, while the minor portion is credited to the drawer and checked out without notice by the Bank of the fraud. We are of the opinion that the

same rule should apply as where the Bank buys the draft, because the doctrine is well settled in Texas that money, or negotiable instruments received in payment of, or as security for, an antecedent debt,. is received for value, and restoration thereof to the true owner or to the person defrauded of same cannot be required unless at the time same was paid or pledged the recipient had notice of the real ownership of the fraud. Craig & Ogden v. Marx & Kempner, 65 Tex. 653; Gaston & Ayers v. Campbell Co. (Sup.) 140 S. W. 770; Rowe v. Gohlman, 44 Tex. Civ. App. 315, 98 S. W. 1079; Staff v. Bank, 97 S. W. 1089; .Kauffman & Runge v. Robey, 60 Tex. 308, 48 Am. Rep. 264. In the case of Blair v. Baird, 43 Tex. Civ. App. 135, 94 S. W. 116, Blair claimed that certain money paid on a contract with Baird, sought to be rescinded by him for fraud, had been received by a bank in payment of a pre-existing debt due by Baird; but the court denied his right to recover same because the money had become Baird's and its subsequent payment to the bank did not authorize a recovery against the bank.

Payment of money for the cancellation of a pre-existing debt being for value, we see no reason for making a distinction between buying the draft before its payment and buying the proceeds after its payment, which was virtually done in this case by canceling a debt and giving credit for the remainder with the consent of the shipper.

[23] But it is urged that in this case no money was actually received by this appellant, as it merely received credit by the Houston bank. Moody & Co. doubtless did not pay in cash, but they are out their money just as effectually as if they had paid actual money. Alexandre had put a slip with the drafts and bills of lading containing the words, "Wire payment," so appellant's bookkeeper sent the papers with such instruction, and the further instruction to remit to Union Bank & Trust Company, Houston, for this appellant's credit and advice. Payment was telegraphed on March 17th, and the Bank applied the proceeds to the payment of Hudspeth, Alexandre & Co.'s debt to it, and there remained a balance to the credit of such firm of $3,068.44, which was overdrawn to the extent of $902.99 on the same day. On the 18th $4,000 was deposited with appellant by said firm, which deposit was made by draft coming through the First National Bank of Bowie, and after paying the overdrafts Hudspeth, Alexandre & Co. had left to their credit $3,097.01. On the 18th they received two additional credits aggregating $554.01, and checked out $3,448.67; on the 19th they were credited with $105.78 and checked out $308.13, closing the account. Notice of the fraud was given the Bank on March 24th.

The draft was paid to the Bank's agent on March 17, 1910, and the funds were collected just as much as though the money had been actually paid in cash to this appellant. Peters Shoe Co. v. Murray, 31 Tex. Civ. App. 261, 71 S. W. 977; Zane on Banks & Banking, § 344. Credit was given by appellant upon the faith of the funds in the hands of its agent, its pre-existing debt was canceled, and it gave credit to Hudspeth, Alexandre & Co. for the remainder. In adjusting the rights of the parties the transaction should be considered as if the actual money had been paid by Moody & Co. to this appellant, and by it credited as above stated, which we hold was done in pursuance of the consent of Alexandre, and passed title to the funds as effectually as if they had been paid to Alexandre and he had paid same to the extent of the debt due by Hudspeth, Alexandre & Co. and had deposited the remainder and afterwards checked it out. See also, Fidelity Mutual Ins. Co. v. Clark, 203 U. S. 65, 27 Sup. Ct. 19, 51 L. Ed. 91.

Appellees cite the case of Davis v. Panhandle Nat. Bank, 29 S. W. 926, which merely holds that a deposit in the name of a bank's debtor, but held in trust for another, cannot be appropriated by the bank in payment of its claim, but it does not hold that a payment of such fund by the trustee to one having no notice of the trust could be recovered. The bank, having shown that it paid value for the proceeds of the draft in the usual course of business, without notice of the fraud through which such proceeds were obtained, was entitled to retain same.

We are of the opinion that the judgment of the trial court against this appellant should be reversed for the reasons stated, and that judgment should be here rendered in favor of the Bank, unless one or more of the additional theories presented by appellees, upon which they in their brief base liability on the part of the Bank, are meritorious. We will discuss those contentions only which have not been covered in passing upon the case as submitted.

[24] Appellees contend that the draft was conditioned upon bill of lading for 485 bales of cotton being attached, and that, such condition not being complied with, the money thereon can be recovered. The draft reads as follows: "Bowie, Texas, March 16, 1910, B–L for 485 B–C attached. Pay to the order of the City National Bank $26,675.00 (twenty-six thousand six hundred and seventy-five dollars),. value received, and charge to the account of G. Alexandre. To W. L. Moody & Co., Galveston, Texas." Said. draft has the indorsement "G. Alexandre" on its back, also the following indorsement stamped with rubber stamp: "This Bank hereby notifies all parties concerned that it is neither responsible for the quantity, quality or delivery of goods covered by this B–L or otherwise. The City National Bank of Bowie, Texas." On its face appears the following indorsement: "March 18, 1910. Accepted." "Payable at the City National Bank at Galveston, Texas, W. L. Moody & Company, Unincorporated."

The other two drafts were exactly the same, except that one was drawn through the First National Bank of Bowie; all of them containing the same indorsements. The bills of lading attached to drafts also contained the rubber stamp indorsement of this Bank. Appellees contend the statement "B–L for 485 B–C attached" is a condition, in the nature of a warranty that the bill of lading covers 485 bales of cotton. In view of the other indorsement, we do not see how such contention can be maintained, and as the acceptance is absolute, not attaching any condition we hold that the draft was not conditional.

[25] Another contention made by appellees is that Hudspeth, Alexandre & Co. became the agents of the Bank in the matter of realizing money on the cotton to pay the Bank. This contention is based upon the theory that the bank had a lien upon the cotton received by Moody & Co. It cannot be contended that every mortgagee consenting to a sale by the mortgagor constitutes the mortgagor his agent and becomes responsible for his warranties. When we investigate the transaction in this case, we find nothing more than a permission on the part of the creditor to sell at a distant place, and the further permission to take the necessary steps to do so. The fact that the creditor is to receive nearly all the proceeds to pay his claim makes no difference in principle. The Bank did not undertake to sell the cotton, nor appellees to buy from the Bank, and we fail to see how it can be said that the sellers became the agents of the Bank.

The next contention is that money obtained by this Bank for account of Alexandre could not, in the absence of specific instructions from him, be credited to the account of the firm of which he was a member, and offset against an overdraft of that firm with the Bank.

This matter has been discussed in going over the facts, and we have there stated that Alexandre himself must be held to have authorized the crediting of the money to the account of the firm. We conclude that no judgment should have been rendered against the Bank, and that it is entitled to have judgment rendered in its favor in this court.

[26] Assignments of error having been sustained in favor of the Compress Company and the Railway Company, it becomes necessary under rule 62a, adopted by the Supreme Court (149 S. W. x.) to become effective on November 15, 1912, to determine whether the errors committed amounted to such a denial of the rights of said appellants as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment against them. The evidence complained of in the Compress Company's first assignment is the correspondence between Moody & Co. and G. Alexandre with reference to the consignment of cotton. This evidence was admissible against Alexandre,

and same in no way reflects upon Compress Company. We fail to see how the jury could have considered it as of any consequence as against said company.

[27] The testimony of Layton complained of in the second and third assignments, in substance, is that in December, 1909, Hudspeth asked Layton, who was running a compress at Bowie, to tear up some cotton and reduce the size of some bales of cotton, and witness told Hudspeth he did not care to do it, and that the bales referred to were medium-sized bales. Also, the following testimony by Layton: "I am superintendent of the North Western Compress Company at Bowie, and have been for two years, past. I don't remember to have had any dealings with A. D. Hudspeth on March 14, 1910; but I did have some dealings with him on or about the last day of January or the first day of February, 1910. I had a conversation a short time before March 14, 1910, relative to the compressing of some cotton. On January 31, 1910, there was some cotton being sent to the press from the city yards and delivered for account of Hudspeth, Alexandre & Co., which cotton I wished to press, but Mr. Hudspeth did not want the same pressed, but wanted to have same go out uncompressed. I told him the press was ready to press it. He tried to get me to say that the cotton reached the press before we opened up to press it. On January 31, 1910, I had the conversation as stated above, and on February 1, 1910, I had the following conversation: On the morning of February 1, 1910, when I went to the press, Mr. Hudspeth was there and had some men and was loading his cotton into some cars on the Denver Road, with the compress trucks. I stopped the men from using the compress trucks. He told me not to press his cotton. I told him I would let it go flat if he would pay the flat charges. At first he thought the flat charges too much and tried to load the cotton himself with some other trucks, but quit trying to load it and came down to the office and said he would pay the flat charges if I would load the cotton out. I asked him where was the money, and he said he would pay me after I loaded it. We could not agree on that, but did agree that if he would give a check to be held by Mr. John Wales, till the cotton was loaded, that I would load the cotton, and then the check was to be given to me. He wrote the check out for the proper amount of flat charges and placed same in the hands of John Wales to be held till I loaded the cotton. After he had written the check, I asked him if the money was there to pay the check, and he said it was."

While none of this testimony was binding on the Compress Company, yet none of it is calculated to injure said company unless the refusal by Layton to reduce the bales be construed as having been based upon his belief that the act would be wrong, in which case

such testimony would naturally constitute a reflection upon the conduct of this appellant in splitting the bales. However, we have no doubt that the judgment would have been the same had this testimony been entirely excluded, and, believing the judgment against the Compress Company to be the proper one, we do not feel justified in reversing the same on account of the admission of said evidence or that complained of under the first assignment.

Errors committed against the Railway Company have been pointed out in discussing assignments Nos. 11 (1), 20, 21, 22, and 24. The one pointed out under No. 11 (1) has been held harmless by us as shown by our discussion of said assignment. Assignment 20 complained of the admission of the telephone conversation between Barden and Ayers; assignment No. 21, of the admission of the correspondence between Moody & Co. and Alexandre; assignment 22 of the admission of the conversation between Graham and Ayers; and No. 24 of the admission of the testimony of Layton, being the same complained of by the Compress Company in its first assignment of error.

We do not think the Railway Company was injured by the failure of the court to limit this testimony. The jury certainly could not construe it as prejudicial to this appellant upon the issues submitted by the court affecting it. The judgment against the Railway Company is based upon its issuance of the bill of lading and the notice it had through the Compress Company, and we are of the opinion that such judgment was proper, and that the jury would have returned a verdict against this appellant even had such testimony been entirely excluded.

The judgment of the trial court is affirmed in so far as it was rendered in favor of the plaintiffs below against the Wichita Falls Compress Company and the Missouri, Kansas & Texas Railroad Company of Texas, and also in so far as it gives said Railroad Company judgment over against the Compress Company, but is reversed in so far as it gives plaintiffs a judgment against the City National Bank of Bowie, and gives said Railroad Company a judgment over against said Bank, and judgment is here rendered in favor of the Bank as against the demands of both of said parties.

Affirmed in part, and reversed and rendered in part.